**NORTH SLOPE TECHNICAL
LIMITED, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 291–86C.

United States Claims Court.

Jan. 21, 1988.

R.R. De Young, Anchorage, Alaska, for plaintiff. Bruce E. Davison, of counsel.

Howard Lipper, with whom were Asst. Atty. Gen. Richard K. Willard and David M. Cohen, Washington, D.C., for defendant. Richard L. Eckert, Anchorage, Alaska, of counsel.

## OPINION

BRUGGINK, Judge.

This is a direct access government contracts case filed pursuant to 41 U.S.C. § 609(a)(1) (1982). Plaintiff North Slope Technical Limited, Inc. ("North Slope") seeks an equitable adjustment for an alleged Type I differing site condition[1] encountered during contract performance at Eielson Air Force Base near Fairbanks, Alaska. Specifically, North Slope claims that it encountered water conditions during excavation that were unanticipated in view of project plans and specifications, thus requiring a complex and costly dewatering system. Upon consideration of the evidence presented at trial,[2] the parties' submissions, and the applicable law, the court concludes for the reasons stated herein that plaintiff is entitled to judgment in the amount of $1,280,675.49.

## FACTUAL BACKGROUND

On January 5, 1985, the U.S. Army Engineer District, Alaska, issued Invitation for Bids ("IFB") No. DACA85–85–B–0009 for the construction of an underground concrete utilidor[3] at Eielson Air Force Base—the Extend Utilities Cool Home (Utilidor) project.[4] The bidding documents specified that offers were due by February 5, 1985. On January 17, 1985, a pre-bid conference/site visit was held at Eielson. Although North Slope did not attend the conference, it did receive the minutes of the meeting.[5] The minutes[6] indicate that Ken Larson, the Fairbanks Resident Engineer for the U.S. Army Engineer District, Alaska, stated:

The plans and specifications indicate a high water table. Virtually every manhole and most of the concrete utilidor sections will involve work at or below the water table, so you should anticipate dewatering problems. Be sure to study the plans and specifications for borings and work elevations, and note the amount of snow (three to four feet) that is presently on the work site. We do not consider the present accumulation of snow to be abnormal, but it will certainly affect your onsite start date, as well as the water table. The dewatering aspect is probably the key to the whole job.

The plans and specifications for the Extend Utilities Cool Home utilidor project (the "Cool Home project") contained detailed information as to the expectable sub-

---

1. A Type I differing site condition pertains to subsurface or latent physical conditions at the site that differ materially from those indicated in the contract. See Federal Acquisition Regulations ("FAR") § 52.236–2, 48 C.F.R. § 52.236–2 (1986).

2. The court admitted plaintiff's exhibit #67 and defendant's exhibit #2 (part 1) at trial over objection. Counsel were invited to address more fully their objections in post-trial briefs. Neither party's post-trial submission pursued the original objection. In any event, the court has not considered either document in reaching its findings and conclusions.

3. A utilidor is a utility corridor within which electrical, water, steam, condensate, and sewage lines are encased. It is designed to protect these utility lines from freezing as the result of subarctic weather conditions encountered at Eielson.

4. The utilidor was needed to extend utility lines to the Cool Homes Housing Project at Eielson.

5. North Slope representatives made several site visits during January 1985.

6. Bidders were told that the site visit minutes would not be incorporated into the contract.

surface groundwater conditions at the construction site. This information was in the form of test hole soil boring logs, monitoring well data, snowfall data, and other hydrologic information. Bidders were provided with two sets of boring logs. The first reflect borings taken in 1965. Eight of these borings were in the general area of the Cool Home construction site:

| Hole Number | Location [7] | Date | Depth to Groundwater |
|---|---|---|---|
| AP–4009 | MH 800 | 27 Aug. 1965 | 4.7 feet |
| AP–4010 | MH A/MH B | 27 Aug. 1965 | 3.7 feet |
| AP–4011 | MH A/MH B | 27 Aug. 1965 | 4.6 feet |
| AP–4012 | MH A/MH B | 27 Aug. 1965 | 4.8 feet |
| AP–4013[8] | | 27 Aug. 1965 | 4.7 feet |
| AP–4069 | MH P/MH 822 | 9 Sep. 1965 | 6.0 feet |
| AP–4071[9] | MH P/MH 822 | 9 Sep. 1965 | 3.6 feet |
| AP–4072 | MH P/MH 822 | 10 Sep. 1965 | 3.8 feet |
| AP–4076 | MH M/MH P | 10 Sep. 1965 | 4.8 feet |

7. The location of a test hole is expressed in terms of its proximity to a particular manhole ("MH") on the utilidor. For example, test hole AP–4076 appears between manhole M and manhole P. The locations of the test holes and the manholes are shown on figure 1. The C-shaped bold line on the figure represents the utilidor.

8. It is not clear whether hole number AP–4013 is located on the project construction site. The hole does not appear on the site plan and legend contained in the contract drawings.

9. Although hole number AP–4071 does not appear on the "Ground Water Data" figure, it does appear on the site plan and legend contained in the contract drawings.

**FIGURE 1** *

GROUND WATER DATA
FROM
BIDDING DOCUMENTS

*This figure is approximately 30 percent of the size of
the original exhibit.

Depth to groundwater signifies the number of feet from the top of the hole to the groundwater level. However, because the 1965 boring logs did not provide the elevation for the top of the hole (which would normally be expressed in feet above sea level), bidders could not readily determine the groundwater level from these logs.

Bidders were also provided with twenty-one soil boring logs taken in March 1984.

Four of these logs were taken at test holes near Twin Lakes, approximately 1200 feet east of the Cool Home construction site. In addition, five of the logs did not provide the depth to groundwater measurement, thus preventing a determination of the groundwater level. The remaining boring logs contained the following groundwater level information:

| Hole Number | Location | Date | Groundwater Level |
|---|---|---|---|
| AP–4482 | MH D/MH E | 9 Mar. 1984 | 523.5 feet |
| AP–4483 | MH E/MH F | 9 Mar. 1984 | 523.5 feet |
| AP–4485 | MH E/MH F | 10 Mar. 1984 | 518.0 feet |
| AP–4486 | MH F/MH G | 11 Mar. 1984 | 526.5 feet |
| AP–4487P | MH G/MH H | 11 Mar. 1984 | 524.5 feet |
| AP–4488 | MH H/MH J | 11 Mar. 1984 | 522.0 feet |
| AP–4489 | MH H/MH J | 11 Mar. 1984 | 526.0 feet |
| AP–4490(P) | MH J/MH K | 12 Mar. 1983[10] | 525.0 feet |
| AP–4494 | MH H/MH J | 13 Mar. 1984 | 523.5 feet |
| AP–4497P | MH E/MH F | 14 Mar. 1984 | 524.0 feet |
| AP–4498 | MH F/MH G | 14 Mar. 1984 | 523.0 feet |
| AP–4501 | MH H/MH J | 15 Mar. 1984 | 525.0 feet |
| AP–4504 | Twin Lakes | 16 Mar. 1984 | 524.9 feet |
| AP–4505 | Twin Lakes | 16 Mar. 1984 | 518.0 feet |
| AP–4506 | Twin Lakes | 16 Mar. 1984 | 522.5 feet |
| AP–4507 | Twin Lakes | 16 Mar. 1984 | 526.0 feet |

The bidding documents also contained the following information regarding dewatering and the boring logs:

Elevations of water table shown on the exploration logs were measured at the time of drilling and shall be considered as representative only for that specific location at that specific time. Additional data on subsurface conditions are available for review in the Office of the Alaska District Engineer [in Anchorage].

. . . .

. . . Excavation shall be performed in the dry. . . . Excavations shall be kept free from ponding until the permanent work in the excavations have been completely backfilled. Piezometric observations are provided below. Such ground water level information as appears in the contract documents is for general infor-

mation only, and shall not constitute a basis for claim for differing site conditions. Actual water levels encountered may vary widely from those shown.

### WATER TABLE OBSERVATIONS

| Boring No. | Date | Elevation [*] |
|---|---|---|
| AP–4487 | 11 Mar 84 | 524.5 |
| | 13 Mar 84 | 524.6 |
| AP–4490 | 12 Mar 84 | 525.0 |
| AP–4497 | 14 Mar 84 | 524.0 |

[*] Elevations are scaled from available maps, and are approximate . . . .

The ground water level records reproduced at the end of this section are for an observation well maintained by the U.S.G.S. [United States Geological Survey] near the east end of the runway [at Eielson Air Force Base], and provide an indication of the seasonal variations in the local ground water levels.

**10.** Although the boring log lists March 12, 1983 as the date that the hole was completed, this was apparently not correct. The date should be March 12, 1984.

The four water table observations included in this portion of the bidding documents, three of which were extracted from the 1984 boring logs, refer to piezometric measurements,[11] considered to be more accurate indications of groundwater levels than other measurement techniques.

The U.S.G.S. observation well referred to in the excerpt is approximately 12,500 feet south of the Cool Home project area. The court has used data from the U.S.G.S. well to derive the following groundwater levels at the observation well:

| | Monthly Average Groundwater Level (feet) [12] | | | | | | |
|---|---|---|---|---|---|---|---|
| | Mar. | Apr. | May | June | July | Aug. | Sep. |
| Year | | | | | | | |
| 1975 | 530.9 | 530.8 | 532.1 | 531.5 | 531.5 | N/A | N/A |
| 1976 | N/A | 531.5 | 531.3 | 531.2 | 531.6 | 532.0 | 531.0 |
| 1977 | 531.5 | 531.6 | 531.3 | 531.5 | 531.2 | 530.9 | 531.0 |
| 1978 | 531.4 | 531.5 | 531.4 | 530.9 | 530.7 | 530.7 | 530.6 |
| 1979 | 531.4 | 531.6 | 531.6 | 530.9 | 531.0 | 530.9 | 530.8 |
| 1980 | 531.9 | 531.5 | 530.8 | 530.7 | 530.9 | 530.9 | 530.8 |
| 1981 | N/A | N/A | N/A | 530.8 | 531.2 | 531.3 | 531.0 |
| Average | 531.4 | 531.4 | 531.4 | 531.1 | 531.2 | 531.1 | 530.9 |

North Slope submitted the lowest bid on the Cool Home utilidor project and, on March 5, 1985, was awarded the contract. North Slope's bid—$4,947,000.00—was $1,550,000 below the Corps of Engineers' February 1985 in-house estimate and $550,000 below the next lowest bid. North Slope anticipated that dewatering at the Cool Home site would cost $75,000. This amount was based on what North Slope believed would be an average groundwater level of 524 feet across the construction site. The Corps' in-house estimate did not contain any amount for dewatering.

On March 18, 1985, North Slope received notice to proceed. A beneficial occupancy date of September 22, 1985 and a completion date of November 15, 1985 were established by the Government. On May 3, 1985, North Slope began to mobilize its equipment at the Cool Home construction site.[13] It commenced clearing and grubbing on May 14, 1985 and excavation on May 15, 1985.

North Slope planned to begin simultaneous construction at separate locations where the utilidor excavation was substantially above the estimated groundwater table. It planned to do construction that required deeper excavation at a later time. North Slope's original dewatering plan was to dig shallow trenches in the bottom of the utilidor excavation that would funnel seepage toward low points in the excavation; the water would then be removed from the excavation site through the use of sump pumps. North Slope also included in its $75,000.00 dewatering estimate the possibility of placing drain pipes in the shallow trenches to increase the efficiency of the gravity drain system. In addition, if sump pumps were ineffective to dewater the four lift stations along the utilidor,[14] North

11. A piezometer is an open pipe, with approximately a 1.5 inch diameter, that extends below the water table. It has a screen at the bottom that allows water into the pipe.

12. Figures are rounded to the nearest tenth of a foot.

13. Although the notice to proceed was issued in March, because of the severe winter environment, most outdoor construction at Eielson is completed within a short summer season between May and October of each year.

14. The lift stations are used to pump sewage through the utilidor. They extend approximately thirteen feet below the bottom of the utilidor at manholes E, G, H, and K. Following award of the contract but prior to commencement of work, the utilidor was redesigned to contain only three lift stations. Neither party presented evidence as to which of the four lift stations was eliminated.

Slope planned to use a deep well (80 to 100 feet deep) and a twenty-five horsepower submersible pump at each station.

After North Slope began construction, it became immediately obvious to all parties that the originally planned dewatering system could not control the flow of groundwater into the utilidor excavations. Moreover, the water conditions prevented North Slope from proceeding with excavation at several locations simultaneously, as contemplated by its initial schedule. According to the testimony of Vernon Lon Boyles, president of North Slope, test holes dug by North Slope on May 16, 17, and 18, 1985 indicated that groundwater levels were as high as 532 feet near manhole M. According to measurements taken on May 18, 1985 by Ken Haggard, North Slope's senior project manager, the water level was 530 feet at manhole B, 529 feet at manhole D, 530 feet at manhole G, 530.5 feet at manhole K, and 531.5 feet near manhole M. On approximately May 20, 1985, Boyles telephoned the Corps of Engineers Resident Engineer in Fairbanks[15] giving notice that a differing site condition existed. *See* FAR § 52.236-2, 48 C.F.R. § 52.236-2 (1986). The phone call was contemporaneous with a letter providing the same notice. On May 21, 1985, the Resident Engineer responded:

> The differing site condition you indicated was the occurrence of a high water table (approximate elevation of 531 to 532 feet) in the vicinity of Manholes M and N, as evidenced by water in the trench encountered as a result of your trench excavation operations on that date.

> This condition was promptly investigated by you and Mr. Paul Sobieski of my staff late in the afternoon on May 20,

1985, and the water table was indeed as high as you indicated. However, it is my determination that no differing site condition has occurred and that this high water table could and should have been reasonably anticipated due to the following:

a. Federal Acquisition Regulation 52.-236-3, Site Investigation and Conditions Affecting the Work, requires you to investigate and satisfy yourself as to the general and local conditions affecting the work, of which the water table location is a critical factor. Based on your recent experience at Eielson Air Force Base on Contract DACA85-84-C-0023, Extend Utilities Loop Taxiway,[16] I am sure you have a great deal of experience and familiarity with the location and fluctuation of the water table at the site.

b. Technical Specification Section 02221, Earthwork for Utilities: paragraphs 6, SUBSURFACE INVESTIGATIONS, and 10.4, Drainage and Dewatering, and the included Ground-Water Levels and Exploration Logs give extensive notice of local water level variations at the site.

c. The Pre-Bid site visit conducted on January 17, 1985, offered extensive information concerning the occurrence of a high water table and further cautioned prospective bidders to anticipate dewatering problems.

On May 21, 1985, to determine the extent of the problem, Ken Haggard took additional groundwater measurements at several test holes on the site. Although these measurements were presented in North Slope's February 1986 differing site condition claim to the contracting officer ("CO"), they were not discussed significantly at

---

**15.** The Alaska District of the Corps of Engineers performed the functions of project design and administration of funding for the Cool Home project. The Alaska District Engineer was the contracting officer. Post-bid administration and supervision of the project was delegated to the Fairbanks Resident Office, under the direction of the Fairbanks Resident Engineer, Ken L. Larson.

**16.** North Slope's first construction contract, which was awarded in 1984, was to construct

the Corps of Engineers Extend Utilities Loop Taxiway Utilidor project (the "Loop Taxiway project") at Eielson. The groundwater table levels encountered by North Slope on the Loop Taxiway project were essentially as represented in the contract plans for that project. Despite a near record snowfall, no dewatering problems were experienced that were in any way comparable to the problems encountered by North Slope on the Cool Home utilidor project.

trial. The measurements show groundwater levels of 529.5 feet at manhole B, 527 feet at manhole D, 528 feet at manhole G, 529.5 feet at manhole K, and 529.8 feet at a point between manhole M and manhole N.

Also on May 21, 1985, Tom Long, a representative of Stang Hydronics, Inc. ("Stang"),[17] arrived at the Cool Home construction site at the request of North Slope. To determine the severity of the groundwater problem, North Slope, based upon Mr. Long's recommendation, dug several large rectangular pits that extended below the water table. A large diameter (approximately 2.5 feet) perforated corrugated metal pipe ("CMP") was placed vertically into each pit. The gap between the CMP and the limits of the test pit was filled with pea gravel. A submersible pump was installed at the bottom of the CMP. Based on the results of the pump tests conducted at these pits, Mr. Long

recommended that either a system of deep wells (approximately forty feet deep) or a well point system should be used to dewater the site. Mr. Long also suggested that additional pump tests be conducted to determine the needed spacing of wells in a deep well system. After making his recommendations, Mr. Long left the Cool Home construction site to return to a different project. Arctic Alaska Test Labs ("AATL") was then engaged by North Slope to conduct a groundwater monitoring program and gather on-site data both in an attempt to determine the reason for the high groundwater table and to assist in deciding what type of dewatering system would be necessary to deal with the problem. Between May 31 and June 4, 1985, AATL drilled a total of fourteen monitoring wells around the utilidor construction site. The following groundwater level data were recorded by AATL:

| Well No. | Location | Water Level at Time of Well Completion [18] | 6/04/85 Level | 6/14/85 Level |
|---|---|---|---|---|
| 1 | MH D | 525.20 | 525.65 | 525.59 |
| 1A | MH D | 525.69 | 525.69 | 525.64 |
| 2 | AP–4483 | 526.52 | 526.45 | 526.36 |
| 3 | AP–4496 | 526.60 | 526.45 | 526.51 |
| 4 | AP–4490P | 528.23 | 527.98 | 527.70 |
| 4A | AP–4490P | 527.67 | 527.67 | 527.37 |
| 5 | AP–4493 | 529.60 | 529.17 | 528.84 |
| 6 | AP–4076 | 528.43 | 528.37 | 528.16 |
| 7 | AP–4011 | 524.14 | 524.14 | —— |
| 8 | AP–4497P | 525.68 | 525.68 | 526.77 |
| 9 | AP–4487P | 527.20 | 527.20 | 527.19 |
| 10 | MH H[19] | 526.99 | 526.99 | 526.81 |
| 11 | AP–4488 | 527.52 | 527.52 | 527.30 |
| 12 | N/A | 524.34 | 524.34 | 528.33 |

On May 29 and 30, 1985, Earthmovers, Inc., a local contractor hired by North Slope, drilled two drawdown wells [20] to test the potential effectiveness of dewatering efforts. Beginning on June 3, 1985, North Slope performed several tests at the two

drawdown wells to determine the impact of various size pumps on the groundwater level. Measurements taken at the monitoring wells indicated the impact of pumping at the two drawdown wells. After consulting with Stang regarding the results of

17. Stang Hydronics, Inc. is a dewatering consultant and contractor.

18. All groundwater levels are expressed in feet above sea level.

19. Monitoring well # 10 is referred to by AATL as being located at lift station # 3 (northeast of

AP–4496); lift station # 3 is located at manhole H.

20. One of these wells was apparently located at manhole D and the other at manhole K.

these tests, North Slope concluded that a deep well system would be sufficient. Hatch Drilling Co. ("Hatch") was hired by North Slope to drill ten-inch diameter wells[21] approximately twenty-five feet deep and placed forty to fifty feet apart from each other along the path of the utilidor. North Slope hoped to pump the water out of these wells as fast as possible so that excavation in the dry could be completed. Between June 12 and June 24, 1985, Hatch placed seventeen wells along the utilidor. These wells proved to be ineffective, however, in reducing the groundwater levels. Consequently, Stang recommended the use of a vacuum well-point system as the only remaining alternative. This initially involved the placement of hundreds of well point pipes at four foot intervals along both sides of the utilidor excavation. A large pump would be used to create a suction that would then be applied to the well points. Groundwater would be drawn up the well point where it would be collected in a large diameter header pipe and transported to a high capacity discharge pump.

On June 24 and 25, 1985, the equipment necessary for the vacuum well-point system was delivered by Stang to the Cool Home construction site. Beginning on June 26th, Stang supervised the installation of the well points. After the installation of the first few vacuum well points and preliminary testing, there was a noticeable decrease in the nearby groundwater table. Different configurations of well points were tried to determine which layout was required to lower the groundwater to a depth at which excavation in the dry could be accomplished.

The initial well point configuration proved insufficient. After doubling the number of well points by positioning them two feet on center, and after receiving a significant amount of additional pumping equipment,[22] the vacuum well point dewatering system became effective (on approximately July 4, 1985). Dewatering in this fashion continued until the middle of October. During the period of dewatering, the Corps of Engineers directed where the water being removed could be pumped. Much of the water was pumped into Moose Lake at the southeast corner of the construction site.

North Slope completed its work in a timely manner and met the beneficial occupancy date established by the Corps. The utilidor and utility systems were accepted by the Government for beneficial occupancy on October 11, 1985. The last day of contract performance was November 15, 1985.

Throughout North Slope's efforts to deal with the groundwater problem, the Fairbanks Resident Engineer was kept on notice of the contractor's various attempts to dewater. The Corps' full-time inspector at the construction site, Joe Durrenberger, noted North Slope's problems and progress in his daily surveillance reports that were transmitted to his superiors. In addition, North Slope personnel regularly measured the groundwater tables actually encountered and reported this information to the Corps. North Slope also kept the Corps informed of its mounting costs and the expected magnitude of its differing site condition claim.[23]

Pursuant to the pertinent contract provisions governing differing site conditions and dispute resolution, *see* FAR §§ 52.233–

**21.** The well itself was a 10-inch diameter perforated pipe placed within a 14 to 16-inch diameter steel pipe, with fine sand poured between the two pipes to act as a filter. The steel pipe was removed before pumping began.

**22.** The number of well points used during dewatering ranged from 200 on July 1, 1985 to 1783 during the latter stages of dewatering (from September 3 to September 30, 1985). In addition, up to nine pumps were needed at certain stages in the dewatering, with capacities ranging from 350 to 2000 gallons per minute per pump.

**23.** By serial letters dated May 30, June 14, June 17, and June 21, 1985, North Slope notified the Corps of its continuing dewatering difficulties and requested assistance and a change order. The Corps did not agree to a change order and insisted upon completion of the contract work pursuant to the original schedule. By serial letter dated July 19, 1985, North Slope reserved its right to recover all associated costs and impacts of the alleged differing site condition, an abnormally high water table.

1, 52.236–2, 48 C.F.R. §§ 52.233–1, 52.236–2 (1986), North Slope submitted timely notice and complied with all requirements for presentation of its claims. North Slope submitted a detailed, three-volume certified claim on February 24, 1986 seeking an equitable adjustment of approximately $2.7 million (including the claims of two subcontractors) for costs incurred in overcoming the allegedly unexpected groundwater levels. The claim was not decided within the statutory period and was thus deemed denied. North Slope filed its complaint on May 7, 1986, pursuant to the Contracts Disputes Act, 41 U.S.C. § 609(a) (1982). Proceedings were suspended to allow the CO to decide North Slope's claim. On August 10, 1986, the CO denied the entire claim. Plaintiff filed an amended complaint on August 18, 1986. Trial was held in Fairbanks, Alaska from August 24 to September 4, 1987.

## DISCUSSION

This case presents two major issues. The primary question is whether the actual groundwater conditions encountered by North Slope at the Cool Home utilidor construction site differed materially from the groundwater conditions indicated in the contract plans and specifications. *See P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984); *Wm. A. Smith Contracting Co. v. United States*, 188 Ct.Cl. 1062, 1088, 412 F.2d 1325, 1339 (1969) (citing *Fehlhaber Corp. v. United States*, 138 Ct.Cl. 571, 585, 151 F.Supp. 817, 825, *cert. denied*, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957)). Although the court concludes that this question must be answered in the affirmative, the magnitude of the differing site condition is less than that claimed by North Slope. North Slope should have anticipated groundwater levels higher than those it originally planned for in its bid but less than the levels actually encountered. Consequently, the court finds that there is a differing site condition, but not to the extent claimed by North Slope. The remaining question then is whether the trial

record provides a sufficient basis for the court to make a fair and reasonable approximation of the damages to which North Slope is entitled.

### A. *Differing Site Condition*

1. Subsurface Conditions Indicated in the Contract

■ North Slope's contract with the Government contained the standard differing site conditions clause, FAR § 52.236–2, 48 C.F.R. § 52.236–2 (1986):

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in the contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

In evaluating a Type I differing site condition claim, the court must determine whether the contractor's interpretation of subsurface conditions as indicated in the contract was reasonable. *Shank–Artukovich v. United States*, 13 Cl.Ct. 346, 350 (1987), *aff'd*, 848 F.2d 1245 (Fed.Cir. 1988). As stated by the Federal Circuit in *P.J. Maffei Building Wrecking Corp.*, 732 F.2d at 916:

Success on a Type I Differing Site Conditions claim turns on the contractor's ability to demonstrate that the conditions "indicated" in the contract differ

materially from those it encounters during performance.... As a threshold matter, then, this kind of Differing Site Conditions claim is dependent on what is "indicated" in the contract.... A contractor cannot be eligible for an equitable adjustment for changed conditions unless the contract indicated what those conditions would supposedly be....

... While it is true that a contract "indication" need not be explicit or specific, the contract documents must still provide sufficient grounds to justify a bidder's expectation of latent conditions materially different from those actually encountered....

Determining whether [plaintiff's] contract with the Government contained any "indications" regarding the [site condition] is a matter of contract interpretation and thus presents a question of law which may be decided by this court for itself.... A proper technique of contract interpretation on this problem is for the court to place itself "into the shoes of a 'reasonable and prudent' contractor" and decide how such a contractor would act in appellant's situation.

(footnote omitted) (citations omitted); *see also H.N. Bailey & Assocs. v. United States*, 196 Ct.Cl. 156, 163, 449 F.2d 387, 390 (1971); *Hegeman–Harris & Co. v. United States*, 194 Ct.Cl. 574, 589, 440 F.2d 1009, 1016 (1971). In addition, plaintiff must prove that it reasonably relied upon its interpretation of the contract plans and specifications and that it was damaged as a result of the material difference between the expected versus the encountered conditions. *Sanders Constr. Co. and Ray Kizer Constr. Co. v. United States*, 220 Ct.Cl. 639, 641, 618 F.2d 121 (1979); *Stuyvesant*

*Dredging Co. v. United States*, 11 Cl.Ct. 853, 858 (1987), *aff'd*, 834 F.2d 1576 (Fed. Cir.1987); *see also Pacific Alaska Contractors, Inc. v. United States*, 193 Ct.Cl. 850, 863–64, 436 F.2d 461, 469 (1971).

North Slope based its bid for the Cool Home utilidor project on an anticipated average groundwater level of 524 feet across the construction site. North Slope arrived at this figure by averaging the March 1984 groundwater levels recorded in the boring logs that were provided in the contract plans and specifications. North Slope then compared the average groundwater elevation with the required depth of excavation for the utilidor (which, per contract specifications, was two feet below the depth of the bottom of the utilidor), and concluded that little dewatering would be required on the project.[24] As support for this approach, North Slope compared its bid with the dewatering cost estimates of two other bidders. H & H Contractors (North Slope's excavation and backfill subcontractor on the project) submitted a subcontract bid of $45,500 per month for dewatering, not including any dewatering at the lift stations, and Stephan/Northern (a joint venture between Stephan & Sons, Inc. and Northern Mechanical Contractors), a separate bidder on the Cool Home utilidor project, estimated dewatering costs at approximately $57,-000.

Defendant contends that North Slope did not act as a reasonable and prudent contractor in interpreting the subsurface conditions indicated in the contract documents. Specifically, defendant argues that (1) North Slope did not conduct an adequate pre-bid site investigation, as required by FAR § 52.236–3, 48 C.F.R. § 52.236–3 (1986);[25] (2) North Slope should

---

**24.** Although North Slope's equitable adjustment request to the CO indicates that a comparison was made between the average groundwater level (523.75 feet) and the *average* depth of excavation (523.54 feet) to conclude that little dewatering was expected, testimony at trial revealed that North Slope also made a site-specific comparison of the actual excavation depths with the average anticipated groundwater level.

**25.** The site investigation clause provides in relevant part:

(a) The Contractor acknowledges that it has taken steps reasonably necessary to ascertain

the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost.... The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from the

have obtained additional data on subsurface conditions from the Office of the Alaska District Engineer in Anchorage (the availability of which was pointed out in the bidding documents); (3) North Slope lacked an acceptable level of knowledge and experience to evaluate the subsurface data provided in the contract; (4) the pre-bid conference/site visit minutes put North Slope on notice of a high water table and possible dewatering problems; (5) North Slope should have utilized the 1965 boring hole data despite the absence of surface elevations; (6) North Slope should not have used an average groundwater level as the basis for its dewatering bid; and (7) North Slope erred in not anticipating a seasonal fluctuation in groundwater levels.

With respect to defendant's first argument that an adequate pre-bid site investigation would have put North Slope on notice of high groundwater levels, it is undisputed that North Slope visited the Cool Home construction site several times in January 1985 before preparing its bid. The court believes that these investigations were adequate and could not have put North Slope on notice of encountering high groundwater levels during excavation. In conducting a pre-bid site investigation, a contractor is held to the standard of rea-

sonableness. *Liles Constr. Co. v. United States*, 197 Ct.Cl. 164, 185, 455 F.2d 527, 538 (1972); *see also W.G. Thompson, Inc.*, HUD BCA No. 79–353–C11, 81–2 BCA ¶ 15,411, at 76,353 ("A reasonable site inspection is properly evaluated against what a rational, experienced, prudent and intelligent contractor in the same field of work could discover."); *Artec Corp.*, ASBCA No. 11257, 66–2 BCA ¶ 5856, at 27,181 ("[The contractor] is chargeable with knowledge of what he could have discovered by a reasonable prebid site inspection, but is not chargeable with knowledge of what would not have been disclosed by such an inspection."). Contractors only had thirty days in which to inspect the project site (between January 5, 1985, when the IFB was issued, and February 5, 1985, when bids were due). North Slope was not required to conduct geological or other technical investigations while investigating the site. *See Foster Constr. C.A.*, 435 F.2d at 888–89. Despite the contention of defendant's experts that North Slope could have made its own soil borings during January 1985, it was not required to do so given the ground conditions (frozen, snow-covered ground)[26] and the short period in which to conduct a site inspection.[27] *See Fehlhaber*, 138 Ct.Cl. at 584, 151 F.Supp. at 825. Consequently, the

drawings and specifications made a part of this contract....

(b) The Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the Government.

To the extent defendant is arguing that this clause overrides the differing site conditions clause, the court disagrees. The duty to make a pre-bid inspection of the site does not negate the differing site conditions clause "by putting the contractor at peril to discover hidden subsurface conditions or those beyond the limits of an inspection appropriate to the time available." *Foster Constr. C.A. and Williams Bros. Co. v. United States*, 193 Ct.Cl. 587, 615, 435 F.2d 873, 888 (1970). In addition, other arguably exculpatory clauses in the contract (e.g., "Such ground water level information as appears in the contract documents is for general information only, and shall not constitute a basis for claim for differing site conditions.") do not relieve the Government of liability in this case. "Even unmistakable contract language in which

the Government seeks to disclaim responsibility for drill hole data does not lessen the right of reliance." *Id.; see also United Contractors v. United States*, 177 Ct.Cl. 151, 165–66, 368 F.2d 585, 598 (1966); *Fehlhaber Corp. v. United States*, 138 Ct.Cl. 571, 584, 151 F.Supp. 817, 825, *cert. denied*, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957); *Jack Crawford Constr. Corp.*, GSBCA Nos. 4089, 4090, and 4120, 75–2 BCA ¶ 11,387, at 54,214.

**26.** Defendant maintains that the large amount of snow on the ground should have given North Slope notice that, after the snow melted in the spring, high groundwater levels would be encountered. Evidence at trial suggested, however, that the groundwater produced by melting snow would have been insignificant. Moreover, although snowfall at Eielson through January 1985 was above normal, it was still below the annual average.

**27.** The bidders that testified at trial did not conduct soil borings. Defendant does not argue that other bidders made soil borings.

court concludes that North Slope did make a reasonable pre-bid site investigation and that this investigation could not have provided notice of unusually high groundwater levels.

Defendant's next argument is that additional data on groundwater conditions could have been obtained from the Corps of Engineers. A bidder should look "at other Government materials (to which he is directed by the contract documents themselves) which qualify, expand, or explain the particular segment of information on which the contractor intends to rely." *Flippin Materials Co. v. United States,* 160 Ct.Cl. 357, 365, 312 F.2d 408, 413 (1963). North Slope alleges that based on its lack of success in previous attempts (before bidding on the Loop Taxiway project) to obtain additional water level information from the Office of the Alaska District Engineer, it would have been futile to seek such information before bidding on the Cool Home project. Furthermore, according to Boyles, telephone calls to the District Engineer's office were made in connection with mechanical aspects of the Cool Home utilidor project, but were not returned.

More important, however, defendant did not argue that the additional information would have provided any relevant new data to bidders. Indeed, if this information was relevant and important to bidders, the Government should have disclosed the information in the contract documents. *See Wm. A. Smith Contracting Co. v. United States,* 188 Ct.Cl. 1062, 1086–87, 412 F.2d 1325, 1338 (1969); *Leal v. United States,* 149 Ct.Cl. 451, 460, 276 F.2d 378, 383 (1960). Moreover, Jerome Raychel, Chief of the Soil Section of the Corps of Engineers in Anchorage, took the position that the Corps would not disclose material information outside the bidding documents to an individual bidder for fear of appearing to favor that bidder. A contractor would have been told to "bid it on the specs." This was confirmed by Michael Goheen, a consultant to North Slope on project management and cost estimation, who testified that he was told the same thing by Cheryl Stewart, the Corps of Engineers' Project Manager for the Cool Home project. Plainly, defendant cannot maintain these three inconsistent positions: (1) the contractor was negligent in not asking the Government for more information, i.e., the Government had relevant (although unidentified) information to give out; (2) it is improper for the Government to give out information to individual bidders; and (3) all relevant information was put into the bid package. For the above reasons, the court considers inconsequential the fact that North Slope did not obtain any additional information.

The court finds defendant's next argument—that North Slope wasn't qualified to evaluate the subsurface data—to be without merit. North Slope only had to act as a reasonable and prudent contractor in interpreting the subsurface indications in the contract. The hydrologic data in the bidding documents were, if accurate, sufficient for a contractor to rely on in making a bid. Absent some reason for North Slope to think the data was insufficient or inaccurate, the court concludes that its failure to hire an expert to interpret the data, or to get additional information, was not unreasonable. To the extent that the Government data was complete, it was sufficiently straightforward that a contractor such as North Slope could utilize it in preparing a bid. The court heard extensive testimony from Boyles and other North Slope personnel and compared it to the testimony of other contractors operating in the Fairbanks area. That comparison suggests that North Slope had comparable levels of knowledge and experience. Accordingly, the court concludes that defendant's argument regarding North Slope's qualifications has no foundation.

Defendant's next contention concerns the "warning" given by Ken Larson at the pre-bid conference/site visit regarding the likelihood of high water levels and dewatering problems. Although not incorporated into the contract documents, that statement clearly should have provided some notice to North Slope that water levels could be above normal, thus justifying the

inclusion of a contingency factor in its dewatering estimate. It does no more, however. The "warning" cannot override North Slope's legitimate reliance on the subsurface indications provided by the boring logs. The information provided by boring logs constitutes contract "indications" of subsurface conditions. *See Woodcrest Constr. Co. v. United States*, 187 Ct.Cl. 249, 255, 408 F.2d 406, 410 (1969), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970); *Morrison–Knudsen Co. v. United States*, 170 Ct.Cl. 712, 718, 345 F.2d 535, 539 (1965). Moreover, borings are "considered the most reliable reflection of subsurface conditions." *United Contractors v. United States*, 177 Ct.Cl. 151, 164, 368 F.2d 585, 597 (1966).

Defendant next argues that North Slope was required to calculate the surface elevations for the September 1965 boring logs. Defendant cites *Space Corp. v. United States*, 200 Ct.Cl. 1, 6, 470 F.2d 536, 539 (1972), for the proposition that a contractor has a duty to inquire and obtain information that is obviously omitted from a set of plans and specifications, such as the surface elevations missing from the 1965 boring logs. In *Space Corp.*, a drawing was omitted that was listed on another document as being included in the bid package. The court held that the contractor should have sought clarification from the Government because the absence of the drawing from the bid package was an obvious omission. *Id.* In the case at bar, however, the missing surface elevations were not an obvious omission. The boring logs contained data other than water levels. North Slope could reasonably have believed that the surface elevations were omitted because the measurements were not made when the boring holes were drilled or, more likely, because the surface elevations would no longer have been accurate due to changes in the landscape. Moreover, defendant has not argued that the surface elevations would have been provided to North Slope if an inquiry was made to the Corps of Engineers; defendant's experts claim only that North Slope could have determined the surface elevations by making a projection back from March 1984 data. The court does not believe that a reasonable and prudent contractor needed to make such a projection in this case. *See Pleasant Excavating Co. v. United States*, 229 Ct.Cl. 654, 656 (1981) ("Contractors are not bound to know that which only an expert could derive from bidding materials.... The knowledge imputed to a contractor is the understanding that a reasonably competent bidder would have from reading the contract documents." (citations omitted)).

Although defendant argues that North Slope could have determined the surface elevations from other contract documents, the testimony of plaintiff's experts clearly establishes that significant construction and excavation had changed the surface level over the twenty year period, and, therefore, that such determinations would have been utterly speculative. Moreover, in a report prepared by Jerome Raychel on July 3, 1986 entitled "Investigation of Differing Site Conditions Claim," he concluded that the 1965 boring logs "cannot be used to determine groundwater table elevation." In addition, five of the March 1984 boring logs do not contain depth to groundwater measurements and likewise cannot be used to determine groundwater levels. As stated by Mr. Raychel, "This leaves 12 borings with ground water indicated which can be tied to an elevation at the site." Accordingly, the court will only consider the groundwater levels contained in those 12 boring logs, in addition to other contract documents, in determining whether North Slope reasonably anticipated dewatering costs.

The court does agree, however, with defendant's argument that North Slope should not have based its dewatering cost estimate on an average groundwater level. There is no question that a measurable gradient (a sloping groundwater flow) exists across the site for the mile-long utilidor. An average groundwater level disregards that gradient and, consequently, the fact that varying groundwater levels could be encountered at different points

along the utilidor.[28] The danger of utilizing an average groundwater level was best summed up at trial by Jerome Raychel.

The court has prepared the following diagram based on his testimony:

This diagram graphically illustrates why averaging the groundwater level readily creates the possibility of underestimating the amount of dewatering. In the above diagram, the wavy-lined area represents the amount of dewatering that would be estimated using an average groundwater level.[29] In actuality, however, the contractor would need to dewater the entire dotted area. Thus, at least in the scenario depicted above, averaging groundwater levels tends to underestimate the actual magnitude of dewatering. The court concludes that North Slope did not act as a reasonable and prudent contractor by basing its dewatering estimate on an average groundwater level. Given the 8.5 foot difference between groundwater levels indicated in the various March 1984 soil borings (526.5–518) and the significant duration of the project, averaging was an unreasonable method for North Slope, as well as the other two bidders who testified, to use.

The court also agrees in part with defendant's final argument that North Slope should have accounted for the possibility of some fluctuation above the indicated groundwater levels. In accordance with the consistent testimony of both parties' experts, the court finds that an examination of the contract plans and specifications should have led North Slope to base its dewatering estimate on a groundwater level that included a variation to account for a possible seasonal fluctuation. *Cf. United Contractors v. United States,* 177 Ct.Cl.

28. North Slope argues that, notwithstanding the gradient, 524 feet was a reasonable figure to use because the U.S.G.S. well data indicates a maximum groundwater level at the Cool Home construction site of 523.13 feet. North Slope computed this level by utilizing information regarding the water table gradient at Eielson contained in a report prepared by defendant's experts: "The water table gradient in the north-south direction across Eielson dips north at approximately on[e] tenth of one percent. This corresponds to a drop of 1 foot per thousand feet." Dames & Moore, Report, Eielson's Cool Home Utilidor Project, Evaluation of Bid Documents and Contractor's Claim Prepared for the U.S. Department of Justice 20 (Aug. 3, 1987) [hereinafter Dames & Moore Report]. Because the Cool Home construction site is approximately 10,000 feet to the north of the U.S.G.S. well (12,500 feet according to the Dames & Moore Report), one would expect a 10 foot drop in water level from the U.S.G.S. well to the construction site. Subtracting 10 feet from the highest groundwater level ever recorded at the U.S.G.S. well (533.13 feet on July 27, 1967), North Slope determined that the maximum water level it would encounter at the site would be 523.13 feet. North Slope made this computation after trial as a post facto rationalization, not before bidding on the Cool Home utilidor project.

For two reasons, plaintiff's argument is unpersuasive. First, evidence presented at trial indicated that a local water table gradient existed at the Cool Home construction site that differed from the regional gradient. Second, and more importantly, the groundwater levels contained in the boring logs—which are what a reasonable and prudent contractor would primarily rely on in formulating its bid—undermine North Slope's determination; the groundwater tables in most of the March 1984 boring logs are above 523.13 feet.

29. The average groundwater level is compared with the various depths of excavation for the utilidor. If the average groundwater level was compared with the *average* depth of excavation (represented by the horizontal dotted line), *zero* dewatering would be estimated; the average excavation depth is above the average groundwater level.

151, 164, 368 F.2d 585, 597 (1966). This variation should have been reasonably anticipated from an examination of the contract plans and specifications. Consequently, the court agrees with the general conclusion of the Dames & Moore report (prepared by the defendant's experts) that, to estimate the amount of dewatering that would be necessary during excavation, a reasonable and prudent contractor would have compared the "predicted water levels ... to the specified excavation limits from which construction must proceed in the dry." Dames & Moore Report at 11.[30] The predicted water levels consist of the March 1984 groundwater elevations listed in the boring logs with a seasonal variation[31] added because excavation for the utilidor was to take place in late spring and early summer (thus requiring a slight adjustment to the March levels).

The bidding documents included a statement that the groundwater levels recorded by the U.S.G.S. observation well "provide an indication of the seasonal variations in the local ground water levels." The table developed by the court on pp. 246–247, *supra*, shows that the *direction* of the variation at any given time of the year is, at best, inconclusive, contrary to defendant's argument. If anything, Boyle's assertion that water levels tend to drop between March and June is somewhat supported by the data. For example, on average, the groundwater level at the U.S.G.S. well drops by 0.3 feet between March and June. Nevertheless, in some years the water level increases and in other years the water level decreases during the same time period. The experts testified to a variation ranging from one foot to over two feet. Jerome Raychel, for example, calculated a 2.23 foot *maximum* variation based on the U.S.G.S. well data. He determined this figure by subtracting the lowest March groundwater level recorded by the U.S.G.S.

well (530.9 feet on March 10 and 15, 1975) from the highest groundwater level recorded (533.13 feet on July 27, 1967). This estimated variation is premised on two incorrect assumptions, however. First, the 2.23 foot variation assumes that groundwater levels increase between March and the summer. As discussed *supra*, it is not clear from the U.S.G.S. well data whether water levels increase or decrease between the two time periods. Second, assuming that groundwater levels do increase between March and the summer, the 2.23 foot variation is the highest possible increase in groundwater levels that would be calculated—i.e., a worst-case scenario. The primary purpose of the differing site conditions clause, however, is to prevent a contractor from bidding on a worst-case scenario basis. See *Ruff v. United States*, 96 Ct.Cl. 148, 164 (1942); *Erhardt Dahl Andersen*, IBCA Nos. 223 and 229, 61–1 BCA ¶ 3082, at 15,961. As stated by the Armed Services Board of Contract Appeals in *Calvada, Inc.*, ASBCA No. 2062, 56–2 BCA ¶ 1033, at 2295:

> [T]he Government's purpose in [adopting the "Changed Conditions" article] was to get the benefits of lower bids by accepting for itself the risk that conditions different from those shown or indicated or conditions unknown, unusual, not ordinarily encountered, and not generally recognized, would be encountered. With the article in the contract, contractors no longer have to anticipate the worst in order to be safe and, thus, the Government presumably gets the benefits of lower bids on its many contracts.

After carefully considering the experts' interpretations of the U.S.G.S. well data and the other evidence of seasonal fluctuations in water levels in the entire Tanana Valley, the court concludes that a reasonable and prudent contractor should add a

---

**30.** The court notes that it considered only the geological and hydrological data presented in the Dames & Moore report, along with any conclusions that were based on that data. The court did not consider the report's conclusory statements regarding the merits of North Slope's claim or any legal conclusions that were discussed.

**31.** North Slope did not have to add any variation for the gradient at the construction site. Any gradient would be implicitly accounted for in the groundwater levels indicated in the boring logs.

small "risk factor" to the groundwater levels provided by the boring logs. Although the experts did not agree on the specific variation, or, as the court refers to it, the "risk factor," the court concludes that a variation of 1.5 feet above March levels is adequate. Implicit in this conclusion is the notion that North Slope should have reasonably anticipated such a variation from an examination of the contract plans and specifications. *See Wm. A. Smith Contracting Co. v. United States*, 188 Ct.Cl. 1062, 1086, 412 F.2d 1325, 1338 (1969). "The very purpose of [the differing site conditions clause] is to prevent bidders from adding high contingency factors to protect themselves against unusual conditions discovered while excavating, for obviously no one can ever know with certainty what will be found during subsurface operations." *Kaiser Indus. Corp. v. United States*, 169 Ct.Cl. 310, 323, 340 F.2d 322, 329 (1965) (per curiam). The objective of the differing site conditions clause is to induce bidders not to "set their estimates on the basis of the worst possible conditions that might be encountered." *Ruff v. United States*, 96 Ct.Cl. 148, 164 (1942). Accordingly, the court finds that a 1.5 foot variation is greater than the amount that a reasonable and prudent contractor would

predict based on a best-case scenario but less than the predicted amount based on a worst-case scenario—an amount that adequately accounts for the risk of a positive groundwater level variance.[32] This risk should have been apparent to a reasonable and prudent contractor upon an examination of the U.S.G.S. well data; consequently, North Slope was incorrect in assuming that groundwater levels would decrease between March and the summer.

If North Slope had based its bid on the March groundwater levels plus a 1.5 foot variation, the highest groundwater levels it should have anticipated ranged from 519.5 to 528.0 feet, depending upon the location along the utilidor. While North Slope was prudent in plotting the actual depth of utilidor excavation across the site as against groundwater levels, it should have utilized these adjusted site-specific groundwater levels rather than an average level to determine the anticipated dewatering effort.

### 2. Groundwater Levels Encountered During Excavation

■ North Slope claims that it encountered groundwater levels as high as 531 and 532 feet [33] on May 20, 1985.[34] The

---

**32.** Of course, it is also possible that late spring/early summer groundwater levels could be 1.5 feet *below* the March levels. However, a reasonable and prudent contractor must base its dewatering estimate on an *increase* of 1.5 feet because the actual level it will encounter is uncertain. Although a contractor does not have to formulate its bid on a worst-case scenario basis, *see, e.g., Ruff*, 96 Ct.Cl. at 164, it must make some estimate for contingencies. *See Erhardt Dahl Andersen*, IBCA Nos. 223 and 229, 61–1 BCA ¶ 3082, at 15,961 (stating that the differing site conditions clause "anticipates that the contractor's bid will reflect neither undue pessimism nor undue optimism"). The differing site conditions clause is "expressly designed to take at least *some* of the gamble out of subsurface operations." *Kaiser Indus. Corp.*, 169 Ct.Cl. at 323, 340 F.2d at 329 (emphasis added).

**33.** North Slope's differing site condition claim was initially advanced on a representation that groundwater was encountered at a level of 531 to 532 feet. These measurements were acknowledged by the Resident Engineer, Ken Larson, in his letter of May 21, 1985, in part based

on the observation of Paul Sobieski, the Corps' project engineer.

It was only eleven days before trial that defendant, for the first time in this litigation, challenged the high water levels and disavowed the May 21 letter. On August 17, 1987, the court permitted defendant to amend its answer to challenge those figures on the asserted ground that "no evidence was obtained during discovery to support the claim that water levels of 531 to 532 feet were observed at the site." Defendant further stated that "the Resident Engineer had no personal knowledge of the reported condition. Moreover, during the depositions of 4 of the individuals identified in the plaintiff's responses to our interrogatories as having knowledge of this condition, each admitted having no personal knowledge of the reported 531 to 532 water table elevations." At trial, the 532 foot level was only supported by Boyle's testimony that he made a visual observation of the groundwater level as contrasted with known surface elevations. While such observations are

following table portrays the groundwater levels that the court believes were encountered by North Slope and the extent of the differing site condition: [35]

| Manhole | Nearest Boring Hole[36] | Elevation at Bottom of Excavation[37] | March 1984 Water Level | Level That Reas. Contractor Would Have Anticipated[38] | Water Level Actually Encountered[39] | Extent of the Differing Site Condition[40] | Differing Site Condition Claimed By North Slope[41] |
|---|---|---|---|---|---|---|---|
| MH 800 | AP–4009 | 521.23 | N/A | — | — | — | — |
| MH A | AP–4009 | 521.49 | N/A | — | — | — | — |
| MH B | AP–4011[42] | 523.74 | N/A | — | 530.0[43] | — | 6.0 |
| MH C | — | 520.85 | — | — | — | — | — |
| MH D | — | 519.77 | — | — | 529.0[44] | — | 5.0 |
| MH E | AP–4482 | 523.50 | 523.5 | 525.0 | — | — | — |
|  | AP–4485 |  | 518.0 | 520.0 |  |  |  |
|  | AP–4497 |  | 524.0 | 525.5 | 526.77[45] | 1.27 | 2.77 |
| MH F | AP–4483 | 524.4 | 523.5 | 525.0 | 526.45[46] | 1.45 | 2.45 |
|  | AP–4498 |  | 523.0 | 524.5 | — | — | — |
| MH G | AP–4486 | 525.43 | 526.5 | 528.0 | 530.0[47] | 2.0 | 6.0 |
|  | AP–4496 |  | N/A | — | 526.51[48] | — | 2.51 |
| MH H | AP–4494 | 524.4 | 523.5 | 525.0 | 526.99[49] | 1.99 | 2.99 |
|  | AP–4487 |  | 524.5 | 526.0 | 527.20[50] | 1.20 | 3.20 |
|  | AP–4488 |  | 522.0 | 523.5 | 527.52[51] | 4.02 | 3.52 |
| MH J | AP–4489 | 523.16 | 526.0 | 527.5 | — | — | — |
|  | AP–4501 |  | 525.0 | 526.5 | — | — | — |
| MH K | AP–4490 | 522.82 | 525.0 | 526.5 | 530.50[52] | 4.00 | 6.50 |
| MH L | — | 524.51 | — | — | — | — | — |
| MH M | AP–4492 | 523.65 | N/A | — | 531.5[53] | — | 7.50 |
| MH N | AP–4493 | 525.72 | N/A | — | 529.17[54] | — | 5.17 |
| MH P | AP–4076 | 522.99 | N/A | — | 528.37[55] | — | 4.37 |
| MH 822 | AP–4069 | 524.57 | N/A | — | — | — | — |
| MH 357–1 | — | 528.79 | — | — | — | — | — |
| AVG. DIFFERING SITE CONDITION |  |  |  |  |  | 2.28 | 4.46 |

unreliable, the court does not totally discount the 532 foot figure for three reasons. First, for the period May 1985 through August 1987, defendant did not challenge the accuracy of this level. To the extent that North Slope could have better prepared its claim or trial presentation if it had known that defendant could challenge the figure, it was too late to do so on the eve of trial. Second, even at trial, Larson did not question the possibility that water levels reached as high as 532 feet. His position was that whatever the level was, it should have been anticipated. The court has rejected that argument. Finally, measurements were introduced at trial showing water levels on May 18 as high as 531.5 feet. Consequently, the court gives some weight to this high range.

**34.** Defendant contends that the high water levels encountered at the start of construction could have been due to "perched" water—groundwater that rests on a layer of frozen soil. Even if the high levels were due to perched water, a reasonable and prudent contractor would not have anticipated such high levels based on the contract plans and specifications. In addition, North Slope's experience—construction of the Loop Taxiway utilidor—would not have alerted it to the possibility of perched water. Based on the high permeability of the soil at the Cool Home construction site, however, the likelihood of encountering perched water was minimal; even if frozen layers of soil existed, water would be able to infiltrate through the frozen soil layers. *See also infra* note 35.

**35.** Much of the experts' testimony at trial concerned the possible causes of the high groundwater levels encountered by North Slope. The causes of unanticipated subsurface conditions, however, are irrelevant in a differing site condition determination, unless the contractor was aware of such causes and should have reasonably based its bid on them. There is no such evidence in this case. For a contractor to be due an equitable adjustment under the differing site conditions clause, the subsurface conditions must differ materially from the conditions indicated in the contract; no further inquiry is necessary. Consequently, the court makes no finding as to the cause of the high water levels, except as discussed in connection with discharge into Moose Lake. *See infra* pp. 260–262.

**36.** The boring holes contained in this column are the ones nearest to the manhole listed in the first column. *See supra* Figure 1.

**37.** The depth of excavation for the lift stations is not presented in this column. The depth of excavation was 511.67 feet for lift station # 1, 513.07 feet for lift station # 2, 512.57 feet for lift station # 3, and 512.27 feet for lift station # 4. Consequently, more extensive dewatering ef-

Based on the second to last column of this table, the court concludes that North Slope encountered a differing site condition of approximately 2.28 feet of water. In other words, the groundwater levels actually encountered during excavation differed from the levels indicated in the contract by about two feet.[56]

In addition to a numerical comparison, however, several facts support the conclusion that North Slope encountered a differing site condition and that the difference in groundwater levels encountered versus reasonably anticipated was material.[57] First, it is significant that the Government's estimate for the cost of the Cool Home utilidor project did not contain *any* amount for dewatering costs. Government witnesses were totally unable to explain this fact. The court subsequently finds that approximately two million dollars was properly spent by North Slope in attempting to dewater. Defendant's argument that North Slope should have built all necessary costs into its bid to take care of water at the highest levels encountered is totally inconsistent with the defendant's willingness to allocate nothing to dewatering. Even if this was an oversight, the court concludes that the ability of the Corps of Engineers to make such an oversight indicates that dewatering costs that should have been anticipated were nowhere near the two million dollars properly spent.

The testimony of other contractors also supports the court's conclusion. Thomas Scarborough, formerly an engineer with

forts would be necessary at the lift stations than at other points of the excavation. North Slope realized this fact and had originally planned to use deep wells to dewater the lift stations; well points were eventually used.

**38.** This column adds the 1.5 foot variation to the March 1984 groundwater levels contained in the boring logs.

**39.** The water levels in this column are obtained from the measurements taken on June 4 and 14, 1985 at the 14 monitoring wells and from other measurements taken by North Slope or the Government during excavation. When more than one measurement for a particular monitoring well exists, the larger measurement was chosen to reflect the highest groundwater level condition that was encountered.

**40.** This column represents the difference between the previous two columns.

**41.** The figures in this column are derived by subtracting 524—the average groundwater level that North Slope had anticipated—from the actual levels encountered (contained in the sixth column of this table).

**42.** AP–4011 lies between manholes A and B, but is slightly closer to manhole B. Although AP–4012 is closer to manhole B than is AP–4011, the court is using the latter because a monitoring well was installed there by AATL.

**43.** Measured by Ken Haggard on May 18, 1985.

**44.** Measured by Ken Haggard on May 18, 1985.

**45.** Measured by AATL on June 14, 1985.

**46.** Measured by AATL on June 4, 1985.

**47.** Measured by Ken Haggard on May 18, 1985.

**48.** Measured by AATL on June 14, 1985.

**49.** Measured by AATL on June 4, 1985.

**50.** Measured by AATL on June 4, 1985.

**51.** Measured by AATL on June 4, 1985.

**52.** Measured by Ken Haggard on May 18, 1985.

**53.** Measured by Ken Haggard on May 18, 1985.

**54.** Measured by AATL on June 4, 1985.

**55.** Measured by AATL on June 4, 1985.

**56.** Although the two foot excess groundwater level condition found by the court is based on only seven points on the construction site (at which March 1984 levels and actually encountered levels were recorded), the court believes, based on the other evidence presented, that these seven points are representative of the high groundwater level conditions across the site.

**57.** The Armed Services Board of Contract Appeals has held that a one to 1.5 foot difference in groundwater levels between the levels encountered and the levels indicated in a document given to bidders was material and constituted a changed condition. *Johnson, Drake and Piper, Inc.,* ASBCA Nos. 9824 and 10199, 65–2 BCA ¶ 4868, at 23,071–72; *see also Peter Reiss Constr. Co.,* ASBCA No. 9801, 66–1 BCA ¶ 5598, at 26, 153 (holding that a three foot rise in the water level was a material difference and constituted a changed condition); *Beacon Constr. Co.,* ASBCA No. 7675, 1963 BCA ¶ 3677, at 18,402 (same).

the Corps and presently a consultant to contractors, testified that he estimated pumping requirements to be about 56,000,-000 gallons. In fact, North Slope pumped over 1.5 billion gallons of water, an amount well beyond what a reasonable and prudent contractor would have expected based on the bidding documents. Similarly, Tom Long, an experienced dewatering consultant with Stang Hydronics, testified that after reviewing the plans and specifications in January 1985, he believed dewatering on the project would be insignificant. He testified that the well point spacing was the most extensive of any project that he had ever been on. *See Maitland Bros. Co.,* ASBCA No. 24032, 85–2 BCA ¶ 18,041, at 90,543 (stating that the use of more expensive equipment and a more time consuming operation were evidence of materiality); *Dunbar & Sullivan Dredging Co.,* ENG BCA Nos. 3165, 3166, 3167, and 3191, 73–2 BCA ¶ 10,285, at 48,560 ("[T]he amount of extra work involved should be of primary consideration in determining the materiality of the changed condition."). Furthermore, other contractors bid similar or only slightly higher amounts for the dewatering aspect of the Cool Home utilidor project.[58]

An additional phenomenon is also supportive of a changed condition. The volume of water that must be pumped increases geometrically with each additional foot of water level to be lowered. This is true because with each incremental linear decrease in the water level, the total area drained expands at a greater rate. The "cone of depression" created at the point of drawdown grows dramatically larger. The result is that lowering the water table from 528 to 526 feet, for example, requires pumping more than twice as much water as lowering the level from 528 to 527 feet.

Finally, Dr. David Kane, one of North Slope's experts, testified that by pumping water into Moose Lake (at the Government's direction), North Slope was exacerbating its problems. Due to the local groundwater gradient, lake water began to flow immediately into the groundwater at the Cool Home site. Kane testified that Moose Lake reached an elevation of 532 feet. In addition, Durrenberger testified that Moose Lake was high enough during the summer of 1985 to reach an overflow level. Defendant's expert, Michael Blackwell, did not challenge Kane's hydrology model with respect to the recharge of the Cool Home site by Moose Lake. If anything, he confirmed it by pointing out that dewatering the Cool Home pad tended to create a groundwater vacuum that was recharged by the lake. His argument that the lake had an adequate surface outlet to accommodate the discharge is rejected by the court. Even the elevation of the surface discharge point presumed by Blackwell—528 to 530 feet—allowed for a lake elevation of up to 531 feet, which is above the highest groundwater levels recorded for most of the adjacent Cool Home site. This recharge phenomenon is also supported by the relatively high degree of permeability of the local soils. In sum, to the extent that the Corps directed discharge into Moose Lake, it exacerbated the dewatering problem. This problem was not anticipated at the time of bidding and defendant has not suggested that it should have been.

Having concluded that North Slope encountered groundwater levels materially higher than the levels indicated in the contract, the court must determine the extent of the equitable adjustment.

### B. *Damages*

▪ In *Roscoe–Ajax Construction Co. v. United States,* 198 Ct.Cl. 133, 458 F.2d 55 (1972), the court described the general formula to be used in determining the amount of damages due a contractor in a differing site conditions case:

> [T]he amount of the equitable adjustment to which the contractor is entitled as a result of a changed condition is 'the difference between what it cost to do the

. The court's reliance on the evaluations and bids of other contractors is discounted somewhat by its disagreement with their use of averaging. The vast differences between what they anticipated and what North Slope encountered, however, can only partly be explained by their use of averaging.

work and *what it would have cost it if the unforeseen conditions had not been encountered.'* ... Accordingly, expenses which the contractor would have been obliged to incur anyway had no changed condition been encountered are not recoverable as part of the equitable adjustment.... The amount of an equitable adjustment for a changed condition is thus not based upon the contractor's original estimate. Similarly, where the contractor could reasonably have handled the changed condition with a less expensive method, the amount of the equitable adjustment will be appropriately adjusted.

*Id.* at 142, 458 F.2d at 60 (quoting *Tobin Quarries, Inc. v. United States,* 114 Ct.Cl. 286, 334, 84 F.Supp. 1021, 1023 (1949)) (emphasis in original) (footnote and citations omitted). North Slope presented its case based on the assumption that its $75,000 dewatering estimate was reasonable in light of the water levels indicated in the contract plans and specifications. As discussed above, the court agrees that a differing site condition existed but nevertheless finds that North Slope's estimate was unreasonable.

The parties' trial presentations were directed at proving one of two extremes. North Slope took the position that any water encountered above 524 feet would be a differing site condition, and presented its damages claim accordingly. Defendant took the position that whatever water levels were encountered were predictable. The court has found that neither position is correct. Nevertheless, sufficient evidence exists regarding the magnitude of the differing site condition, the costs of dewatering, and the relative merits of various techniques to permit a calculation of damages. Between the level North Slope expected and the levels actually encountered, the court thus believes that a fair and reasonable approximation of the damages incurred—a "jury verdict"—can be made, based on the groundwater levels that North Slope should have anticipated. *See Assurance Co. v. United States,* 813 F.2d 1202, 1205 (Fed.Cir.1987); *Joseph Pickard's Sons Co. v. United States,* 209 Ct.Cl.

643, 649–52, 532 F.2d 739, 742–44 (1976); *McCollum v. United States,* 6 Cl.Ct. 373, 379 (1984), *modified in part,* 7 Cl.Ct. 709 (1985); *Jack Picoult,* VACAB No. 1221, 78–1 BCA ¶ 13,024, at 63,536. As the court stated in *Electronic and Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 257, 416 F.2d 1345, 1358 (1969), "[W]here responsibility for damage *is* clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" (quoting *Specialty Assembling & Packing Co. v. United States,* 174 Ct.Cl. 153, 184, 355 F.2d 554, 572 (1966)) (emphasis in original).

North Slope clearly suffered damages as a result of the differing site condition. The court finds that while the dewatering system upon which it based its bid was inadequate considering the groundwater levels that should have been anticipated, the system upon which North Slope should have based its bid would not have been adequate either. Significantly more dewatering would have been necessary, in terms of both the complexity and the amount of equipment, and in terms of the duration of effort. If North Slope had properly determined the anticipated groundwater levels and had anticipated some small fluctuation, it would still have incurred damages due to a differing site condition. Nevertheless, because North Slope improperly used an averaging method to determine the anticipated groundwater level and did not include a variation to account for the risk of groundwater levels increasing between March and late spring/early summer, the amount of claimed damages is overstated.

Several factors make difficult, if not impossible, a determination of the dewatering system that North Slope should have reasonably anticipated and, consequently, the point at which this system would cease being effective because of the differing site condition. The point at which the various dewatering techniques became effective or ineffective is permanently blurred because they were developed under circumstances

that do not lend themselves to segregation. The number of variables and possible scenarios is virtually endless; the volume of water, the efficacy of the various dewatering systems, the lack of certainty as to the sources of the water, and permeability and other recharge variables are a few examples. Consequently, although it is clear that a more extensive dewatering effort should have been anticipated, the court cannot fix with certainty the dewatering method and the associated costs that would have been necessary for this effort. The volume of water that North Slope pumped that constituted the differing site condition can only be speculated at this point. In addition, if North Slope had initially used a more extensive dewatering method, it would have lowered certain costs, such as expenses due to delay and acceleration.[59] The extent of such potential cost savings for which the defendant should be credited is also unascertainable.

Although it is difficult for the court to determine precisely a figure for damages representing the costs that a reasonable and prudent contractor would have incurred, certain evidence exists from which an estimate can be made. The court looks first to the 2.28 foot average difference between the groundwater levels that North Slope should have anticipated and the levels that it actually encountered. Expressed as a proportion of the 4.46 foot average difference between 524 feet and the levels actually encountered, it equates to 51 percent. The court concludes that 51 percent of North Slope's claimed, and justified, damages is an appropriate beginning point for approximating damages. This figure has to be adjusted somewhat, however, to account for two factors previously discussed in connection with whether there was a differing site condition—the fact that each additional linear foot of dewatering adds disproportionately to the total volume to be pumped, and the fact that North Slope was probably pumping some water more than once because of the discharge into Moose Lake. In weighing these factors, the court concludes that sixty percent of total proven costs serves as a fair and reasonable approximation of the costs that North Slope would have unexpectedly incurred had it properly interpreted the subsurface indications in the contract documents. The court is persuaded from its review of the evidence that the incremental expenses due to the differing site condition were not less than sixty percent of total proven costs. Although the incremental expenses may in fact have been slightly greater, North Slope could have overcome any prejudice to it from the above calculation by being more precise in its presentation of damages.

## ALLOWABLE COSTS

North Slope's claimed costs are $2,646,-781.29. However, in a summary of North Slope's claim prepared by Boyles during trial (plaintiff's exhibit #187c), $2,643,-668.63 was listed as the claimed amount. The court believes that this summary was not correctly prepared.[60] The following table illustrates the claim summary prepared by Boyles:

| North Slope Technical | | |
|---|---|---|
| Labor | $ 728,408.00 | |
| Materials | 178,027.00 | |
| Equipment | 621,741.00 | |
| Other Direct Costs | 432,705.00 | |
| | $ 1,960,881.00 | |
| Less Dewatering in Bid | ( 75,000.00) | |
| | $ 1,885,881.00 | |
| Overhead (13.04%) | 245,918.88 | |
| | $ 2,131,799.88 | |
| Profit (10%) | 213,179.98 | |
| | $ 2,334,979.86 | |
| Bond (0.82%) | 19,228.83 | |
| | | $ 2,364,208.69 |

**59.** North Slope had to complete the utilidor before Ben Lomond Construction Company ("Ben Lomond"), the contractor selected by the Government to design and build the housing units at the Cool Home site, could connect the utilities to the houses. North Slope was thus under significant pressure by the Government to complete the utilidor by the agreed-upon date (November 15, 1985) despite the unanticipated dewatering effort.

**60.** The fact that an incorrect statement of damages was admitted at trial by North Slope does not foreclose it from recovering the correct amount of damages.

| Subcontractors | | |
|---|---|---|
| H&H Contractors | | |
| Claim | $ 159,423.00 | |
| Overhead (13.04%) | 20,788.76 | |
| | $ 180,211.76 | |
| Profit (10%) | 18,021.18 | |
| | | $ 198,232.94 |
| Acme Electric | | 81,227.00 |
| | | $ 2,643,668.63 |

| | | |
|---|---|---|
| Overhead (13.04%) | | $ 282,592.57 |
| | | $ 2,449,713.52 |
| Profit (10%) | | 244,971.35 |
| | | $ 2,694,684.87 |
| Bond (0.82%) | | 22,096.42 |
| | | $ 2,716,781.29 |
| Less: Equipment Rental to Ben Lomond | | (70,000.00) |
| | | $ 2,646,781.29 |

In North Slope's February 1986 claim presented to the CO, the claim audited by the Defense Contract Audit Agency ("DCAA"), and the claim summary contained in North Slope's pretrial brief, the total claims of the two subcontractors were added to the subtotal of North Slope's claimed costs *before* the overhead, profit, and bond rates were applied. In addition, North Slope deducted $70,000 from its total claimed costs as a credit for money received from Ben Lomond for use of North Slope's dewatering equipment. Accordingly, the court concludes that the following table properly presents a summary of the claim:

| North Slope Technical | | |
|---|---|---|
| Labor | $ 728,408.00 | |
| Materials | 178,027.00 | |
| Equipment | 621,741.00 | |
| Other Direct Costs | 432,705.00 | |
| | $ 1,960,881.00 | |
| Less Dewatering in Bid | ( 75,000.00) | |
| | | $ 1,885,881.00 |
| Subcontractors | | |
| H&H Contractors | | |
| Claim | $ 158,113.00[61] | |
| Overhead (15.0%)[62] | 23,716.95 | |
| | $ 181,829.95 | |
| Profit (10%) | 18,183.00 | |
| | 200,012.95 | |
| Acme Electric | 81,227.00 | |
| Subtotal | $ 2,167,120.95 | |

The audit conducted by the DCAA questioned $149,246.00 of North Slope's labor costs, $51,216.00 of its equipment costs, and $69,832.00 of its other direct costs (total = $270,294).[63]

Before doing as much of an item-by-item analysis as is possible from the record, the court makes the following two general observations. First, North Slope "bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation." *Willems Indus., Inc. v. United States*, 155 Ct.Cl. 360, 376, 295 F.2d 822, 831 (1961), *cert. denied*, 370 U.S. 903, 82 S.Ct. 1249, 8 L.Ed.2d 400 (1962). A failure to carry this burden may lead to the total rejection of the claim for lack of proof or it may result in a jury verdict. *Jack Picoult*, VACAB No. 1221, 78-1 BCA ¶ 13,024, at 63,534. Second, although North Slope must prove the extent of its damage, there is a presumption that its actual costs paid are reasonable. *Bruce Constr. Corp. v. United States*, 163 Ct.Cl. 97, 103, 324 F.2d 516, 520 (1963). That presumption must be overcome by the Government. *Id.*

Since the presumption is that a contractor's claimed cost is reasonable, the

61. At trial, H & H reduced its pre-overhead-and-profit claim of $173,881.00 by $15,768.00, to $158,113.00. The court has not been able to determine how Boyles derived a pre-overhead-and-profit figure of $159,423.00.

62. H & H claimed at 15% overhead rate in the February 1986 a claim presented to the CO, the claim audited by the DCAA, and the claim summary contained in North Slope's pretrial brief. The DCAA expressed no opinion of this figure. Consequently, the court finds that a 15% overhead rate should be used for H & H, not the 13.04% rate used for North Slope.

63. The questioned costs were $8448.00 higher in the DCAA audit. North Slope, however, conceded that this amount was due to errors in North Slope intercompany billings with its parent corporation (TMI Management, Inc.). Consequently, North Slope reduced its claim by this amount at trial.

Government must carry the very heavy burden of showing that the claimed cost was of such a nature that it should not have been expended, or that the contractors' costs were more than were justified in the particular circumstance.

McBride, *Confusion in the Concept of Equitable Adjustments in Government Contracts: A Reply*, 22 Fed.B.J. 235, 240 (1962), *quoted in Bruce Constr. Corp.*, 163 Ct.Cl. at 102, 324 F.2d at 519.

Defendant has challenged $543,947.62 [64] of North Slope's total claimed costs (as corrected by the court), as explained in the DCAA audit report of July 24, 1987. The report was the result of a careful, lengthy analysis by Anthony Szarleta, a DCAA auditor whom the court gives high marks for competence and credibility. Szarleta spent four weeks at North Slope's offices preparing his report. North Slope's efforts at trial to resuscitate challenged costs were frequently confusing, often not directly in response to the substance of the challenge, and generally not persuasive.

### a. Labor Costs

North Slope claims that its labor costs went up $728,408.00 due to the excess dewatering. This consists of actual booked costs of $265,950.00 and $462,458.00 in loss of efficiency and overtime pay differential.

In performing his analysis, Szarleta broke North Slope's total actual labor costs ($1,041,497.00) into civil and mechanical components, and compared these with the amounts North Slope used in calculating its bid. He prepared the following summary:

|  | Bid | Actual | Difference | Claimed | Questioned Cost |
|---|---|---|---|---|---|
| Civil | $200,901 | $ 780,063 | $579,162 | | |
| Mechanical | 400,413 | 261,434 | Undetermined | | |
| Total | $601,314 | $1,041,497 | $579,162 | $728,408 | $149,246 |

The audit compared actual civil labor costs ($780,063) with anticipated costs ($200,901) and concluded that the difference ($579,162) formed the outer limit of additional labor costs due to dewatering. Given the amount of the claim ($728,408), the audit challenges $149,246.00.

North Slope's only response to this approach is that it is allegedly penalized for generating savings in the area of mechanical labor. It is apparent from the above summary table that North Slope's allocation of $400,413 to mechanical labor was unnecessarily high in retrospect; its actual costs were $261,434, or $138,979 less. According to Boyles, this savings was due to design changes in the assembly of the utilidor. Although the court agrees with North Slope that those savings should not pay for part of the increased cost of civil labor, that is not the effect of the DCAA audit. If it were, the total questioned cost would have been $288,225 ($728,408 − ($1,041,497 − $601,314)). In calculating the differential between actual and bid costs, the auditor made no reduction to reflect the savings on mechanical labor. Mechanical and civil amounts were segregated. The court might have rejected Szarleta's approach to labor if North Slope had been able to document that the original amount anticipated for civil labor was too high, because North Slope generated savings on non-dewatering work, for example. It did not do that, however.

In sum, North Slope's claim for additional labor costs is reduced by $149,246.00.

### b. Equipment

North Slope claims an additional $621,741 in equipment costs due to dewatering. The DCAA audit's only challenge to North Slope's calculation relates to the appropriate amount to deduct from actual costs ($743,025) for the anticipated (bid) costs. In its claim, North Slope listed $121,284 as

---

**64.** The actual total questioned costs were $579,541.00. This amount less the $8448.00 already conceded by North Slope and the $15,768.00 conceded by H & H, including all associated overhead, profit, and bond costs, yields $543,947.62.

its bid amount. In the process of working with the DCAA auditor, North Slope was unable to document that figure. According to Szarleta, there was some support for a lower figure ($95,000), which would have permitted a larger claim by plaintiff. Szarleta did not use that figure, however, because the project budget, developed after the bid but before construction began, contained a figure for equipment cost of $172,-500.00. Szarleta believed that was also the bid figure because in other critical details, the budget and bid breakouts were the same. While Boyles speculated that the budgeted amount might have been changed after preparation of the bid but prior to the start of construction, North Slope made no attempt to demonstrate that with respect to equipment.[65] Nor did North Slope alter its claim and support a higher amount based on the $95,000 figure. Szarleta testified without contradiction that because the budget and bid were identical in so many respects elsewhere, particularly with respect to other direct costs, it was likely that the bid amount for equipment was the same as the budgeted amount. The court accepts that analysis.

Given the absence of any support for the figure initially used ($121,284.00), North Slope's failure to claim, much less document, the $95,000 figure, and the reliability of the $172,500 budgeted amount, the court reduces claimed equipment costs by $51,216 ($172,500 − $121,284).

#### c. Other Direct Costs

Other direct costs claimed for excess dewatering total $441,153.00. These were broken down into those costs identified by North Slope with account number 99001, the dewatering claim in North Slope's accounting records ($177,356), and other dewatering related costs ($263,797). As to account 99001 costs, North Slope has conceded that $8448.00 is correctly questioned in the DCAA report, thus reducing the total claim to $432,705.00. The audit report challenges $69,832.00. The DCAA determined this amount by comparing what it calculated as the bid amount ($233,800.00) with the actual costs ($427,765.00). The difference ($193,965.00) is seen as the outer limit to a claim with respect to the cost categories involved. Subtracting $193,-965.00 from the $263,797 claim for other dewatering related costs yields the $69,-832.00 figure.

In calculating the bid amount for other dewatering related costs, the DCAA deducted $30,000.00 for fuels and lubrication, and $5000.00 for equipment maintenance. In calculating actual expenditures, it deducted $60,227 for those same categories, as shown below:

| Accounts | Bid | Actual | Difference | Claimed | Questioned Cost |
|---|---|---|---|---|---|
| | $268,800 | $487,992 | | | |
| Fuels & Lubes | (30,000) | (44,472) | | | |
| Equip. Maint. | (5,000) | (15,755) | | | |
| | $233,800 | $427,765 | $193,965 | $263,797 | $69,832 |

The audit report backed out fuels, lubrication, and maintenance because they relate to North Slope's use of leased equipment. The audit compared lease rates claimed by North Slope with those in the Corps of Engineers' Equipment Schedule rates. Because North Slope's claimed rates, when considered as a reflection of the amount of utilization, were less than, but approxi-mately the same as, the Corps' schedule rates, North Slope's rate was allowed. What the audit disallowed was any add-on for fuel, lubrication, and maintenance, on the theory that these were already built-in to the Corps rates.

Szarleta's explanation of this adjustment was less than adequate. While Corps rates

---

**65.** The budgeted and bid amounts were, in the aggregate, the same. If there was a $77,500 increase in the budgeted amount for equipment, there would have to be corresponding decreases elsewhere. North Slope offered no evidence of such changes.

incorporate the three additional equipment cost categories, Szarleta only used the Corps rates as a means of generally testing North Slope's own costs. North Slope has not actually gotten the benefit of Corps rates in terms of reimbursement. The present record discloses no basis for the court to conclude that North Slope's equipment rates *plus* fuel, lubrication, and maintenance were unreasonable. For aught that appears, that amount would also have been roughly comparable to the Corps' rate schedule. While North Slope has the burden of proving its costs, *see Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed.Cir.1987), there is a presumption that actual costs paid are reasonable. *Bruce Constr. Corp.*, 163 Ct.Cl. at 103, 324 F.2d at 519. There is no question that the amounts claimed were actually spent. If the audit had utilized the Corps' rate schedule in lieu of both lease costs and fuel, lubrication, and maintenance expenditures, the court might have accepted that approach as a logical alternative. What was done here, however, was to assume, without proof, that plaintiff's lease costs were sufficient to compensate for all rental related costs. The court rejects the audit in this respect. Questioned costs are thus reduced by $25,227.00 ($60,227 − $35,000). Total disallowed costs for "Other Direct Costs" is thus $44,605.00 ($69,832 − $25,227).[66]

### d. Subcontractors

#### 1. *Acme Electric Co.*

North Slope's claim includes $81,227.00 sought for a subcontractor, Acme Electric Co. North Slope has not paid that amount and there was no documentation presented to the DCAA auditor or to the court that would support Acme's claim. It is therefore rejected.

#### 2. *H & H Contractors, Inc.*

The DCAA audit considered a claim by North Slope's subcontractor for excavation work, H & H Contractors, Inc. ("H & H").

Of the $219,960.00 claimed (including overhead and profit), the audit questioned $138,320.00. At trial, the representative of H & H, Anton Johansen, reduced the pre-overhead-and-profit claim ($173,881.00) by $15,768.00 to $158,113.00. The remaining disputed item involves equipment. H & H claims equipment costs of $132,635.00. The amount questioned by the audit, $93,577.00, results from the DCAA's use of the Corps of Engineers' Equipment Ownership and Operating Expense Schedule rates, rather than the Dataquest Blue Book for monthly rental rates used by H & H.

Special clause 29 of the prime contract between North Slope and the Government states:

> (a) Whenever actual ownership and operating costs for each piece of equipment or equipment groups of similar serial and series cannot be determined by the Contracting Officer from a Contractor's accounting records, allowable costs for construction equipment in sound workable condition owned or controlled and furnished by the Contractor or subcontractor at any tier for work requiring adjustments in contract price shall be determined in accordance with the applicable provisions of the "Construction Equipment Ownership and Operating Expense Schedule," Region IX.

This provision is a reflection of FAR § 31.105(d)(2)(i)(A), 48 C.F.R. § 31.105(d)(2)(i)(A) (1986). The provision makes clear that it controls subcontractors as well as general contractors, and that it applies to rented as well as to owned equipment.

There is no dispute that H & H did not keep a record of its actual earthmoving costs. While the court is sympathetic with the subcontractor's argument that the Corps rates do not adequately reflect its costs, H & H had a remedy—it could have kept a record of its actual costs. Not having done so, the court has no choice but to enforce the default rate mechanism provided by the applicable regulation. H & H's

---

**66.** Questioned costs in other categories are based on the difference between bid costs and actual costs. North Slope did not challenge Szarleta's analysis here in any way other than the one discussed. North Slope's generalized objection to deducting the bid amount from actual expenditures is inconsistent with its own approach to calculating equipment costs.

pre-overhead-and-profit claim is therefore reduced by $93,577.00 [67] to $64,536.00. Including overhead (15%, or $9680.40) and profit (10% of $64,536.00 + $9680.40, or $7421.64), H & H's claimed costs are allowed to the extent of $81,638.04.

North Slope's claimed and justified damages are $1,797,452.04 ($1,960,881 − $149,-246 − $51,216 − $44,605 + $81,638.04). Subtracting the portion of North Slope's initial $75,000 bid for dewatering that was not already considered by the DCAA in questioned costs—$39,000 [68]—leaves a total of $1,758,452.04. Adding an overhead rate of 13.04% to this figure gives $1,987,754.19. Adding a profit rate of 10% to this figure gives $2,186,529.60. Finally, adding a bond rate of 0.82 percent to this figure gives $2,204,459.15. Subtracting the $70,000 equipment rental amount received by North Slope from Ben Lomond yields $2,134,459.15. Multiplying this figure by the 60% rate determined by the court, *supra*, as a fair and reasonable approximation of the damages due North Slope provides an equitable adjustment of $1,280,-675.49.

## CONCLUSION

For the reasons expressed above, the court concludes that North Slope encountered groundwater levels that materially differed from the levels indicated in the contract and that North Slope was damaged in the amount of $1,280,675.49. Accordingly, the Clerk is directed to enter judgment for the plaintiff in the amount of $1,280,675.49 plus interest pursuant to the Contract Disputes Act, 41 U.S.C. § 611 (1982), to run from February 24, 1986. Costs to the plaintiff.

---

**67.** The profit and overhead amounts that were included in H & H's claim and questioned by the DCAA do not turn on the particular rates used but on the underlying amounts against which they apply. The DCAA expressed no opinion on H & H's overhead rate (15%) and had no dispute with the claimed profit rate (10%).

**68.** The $75,000 initial dewatering bid was already paid by the Government as part of the original contract amount and therefore must be subtracted from North Slope's total claim for dewatering costs. The court only subtracts $39,-000, however, because the remaining $36,000 was included in the questioned costs for North Slope's labor claim.