**CELERON GATHERING CORPORATION,**
**Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 93–260C.

United States Court of Federal Claims.

Feb. 6, 1996.

Charles A. Patrizia, Washington, DC, with whom were Sarah M. McWilliams, and Joan M. Peyton, Houston, Texas, of counsel, for plaintiff.

Dorann E. Banks, Civil Division, United States Department of Justice, Washington, DC, with whom were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Jeanne Davidson, Assistant Director, and Tom West, Department of Energy, of counsel, for defendant.

## OPINION

MARGOLIS, Judge.

This contract case is before the court after a three-day trial. Plaintiff, Celeron Gathering Corporation (Celeron), contracted with defendant, the United States, to purchase an estimated 10,000 barrels per day (BOPD) of crude oil from delivery location 24Z (24Z) at the Elk Hills Naval Petroleum Reserve (NPR) in Kern County, California. The plaintiff contends that due to production un-

derruns at 24Z the government breached the contract and claims damages of $1,125,602. Plaintiff seeks to predicate liability on a wide array of legal theories, including misrepresentation, failure to disclose superior knowledge, breach of contract, warranty, bad faith, and equitable estoppel. Plaintiff's primary argument is that the government knew or should have known that the contract's BOPD estimate was erroneous because it failed to account for significant operational difficulties experienced by a water disposal well. Defendant argues that it reasonably believed that the problems afflicting the water disposal well were routine and capable of repair and that its conduct before and during contract performance conformed with its obligations under the contract.

## FACTS

Plaintiff was the successful bidder for contract No. DE–SC01–88FE61697, with the United States through the Department of Energy (DOE), for the purchase of crude oil at the NPR for the period of October 1, 1988 to April 1, 1989. Under the contract, Celeron was to receive an estimated 10,000 BOPD of light crude oil at 24Z. Essentially, Celeron's business consisted of gathering crude oil, blending it to quality specifications, and shipping it for resale.

### A. NPR Operations

The NPR produces oil from multiple subsurface geologic formations, two of which, the Stevens Zone and the Tulare Zone, are relevant here. The Stevens Zone is the source of crude oil delivered for purchase at 24Z. Stevens Zone production is routed to different delivery locations, including 24Z and 18G, a neighboring delivery location. At these sites the crude oil is processed and prepared for delivery. NPR operators[1] can send crude oil production normally routed to 24Z to 18G through an adjustment of underlying pipes and valves.

Stevens Zone raw production includes crude oil and associated water and natural gas that are removed before delivery. After the gas is removed from the raw production,

the production is pumped into a settling tank. In the settling tank, the oil and wastewater separate by gravity. The wastewater by-product is disposed of by returning it to designated underground zones. At 24Z the wastewater is reinjected through "water disposal wells" into the Tulare Zone, an underground sandstone formation. The wastewater wells are instrumental to the processing of raw production into deliverable crude oil. At 24Z, water disposal well 24WD–24Z (24WD) was the primary disposal well and its use was therefore critical to full production at 24Z. The underdeliveries of crude oil experienced by Celeron, from October 1988 to early January 1989, were caused by the malfunction of 24WD.

### B. Operational Difficulties Experienced at Water Disposal Well 24WD Prior to Celeron's Contract

Sand in the Tulare Zone formation could enter perforations in the casings of water disposal wells. The casing systems were designed to facilitate reabsorption of the wastewater into the surrounding geology and to exclude as much sand as possible. Periodically, as part of general maintenance, sand was removed by a bailing and foaming process. 24WD was placed into service in 1981, with a total bore hole depth of 930 feet. Perforated fiberglass casing was installed in 24WD. For a few years after its construction, 24WD operated uneventfully, and occasional sand influx was addressed by bailing and foam treatment, as well as acidizing the well.

24WD began to experience difficulties in February 1987. Bailing operations following a well shut down revealed fiberglass fragments from the well casing mixed with sand influx. In the following months, NPR operators initiated a series of repair efforts to end sand influx into 24WD. In April 1987, NPR operators attempted unsuccessfully to introduce a wire wrapped screen into the well. In June 1987, NPR operators successfully inserted a five-inch slotted liner into the well's fiberglass casing. Successful injection then

---

1. At all times relevant to the contract, DOE delegated responsibility for day-to-day production, maintenance, and field operations at the NPR to Bechtel Petroleum Operations, Inc. (BPOI).

resumed until injection abruptly stopped on December 17, 1987. The well was then foam cleaned. An inspection detected two enlarged liner slots at the 416–foot level and the 456–foot level. NPR operators undertook no repair efforts at this time; instead, they foam cleaned the well in January and February of 1988, in order to maintain normal injection levels.

In July 1988 the well clogged, and NPR operators began a bailing operation. The sand influx in this period was substantial and rapid. At one point, tubing that was part of the cleaning operation was stuck for several days in the sand in the well.[2] Hal Owens, a Production Engineering Manager at BPOI, admitted that, after the July events, 24WD could not have been a consistent injector in August or September in the absence of a repair effort.

To address the problem, NPR operators received approval in early September 1988 to install a ten foot and a forty foot casing patch to seal off the enlarged liner slots. By a program revision dated September 8, 1988, however, DOE decided to patch the enlarged liner slots by installing a phenolic resin plug because use of the plug would avoid a long delivery delay for the casing patches. The resin would be released in the well and flow into the enlarged liner slots, hopefully correcting the defect. The resin plug was not a common repair technique, but it had the advantage of being a quick repair method. Owens testified that he believed the resin plug had "a reasonable chance of success" based on the fact that a resin plug had been successful in another well at the NPR, although the other well had less inherent pressure. On cross-examination, Owens stated that, at the time, he felt the resin plug "stood a good chance of working," or a "50/50 chance." Based on this testimony and other evidence in the record, the court does not find that the NPR operators should have known that the resin plug was an inadequate repair measure, although their assessment of the probability of success may have been overly optimistic.

The resin plug was installed in mid-September, and on September 21, 1988 the well was restored to service. The repair appeared to be successful. 24WD, however, began to experience difficulties on September 30. On October 4, the fill in the well was measured at a depth of 415 feet. 24WD was then foamed cleaned, and the fill cleared to the bottom of the well. On October 5, an inspection revealed that the resin plug had failed.

## C. Celeron's Contract and the BOPD Estimate

As specified in the invitation for bids (IFB) and Celeron's contract, the government estimated that there would be 10,000 BOPD of oil available at 24Z. The IFB and the contract explicitly provided that this was only an estimated quantity; that it represented the Government's best estimate of the amount of oil which would be delivered for purchase at 24Z; that the quantity that would be available on any given day would vary depending upon, among other things, practical considerations in field operations; and that the Government made "no representation or warranties as to the quantities of crude oil which will be delivered pursuant to the contract." Plaintiff's Exhibit (Pl.Ex.) 1, Sec. B.004(a), p. 8.

The contract's delivery estimate was originally prepared by BPOI officials and then sent to DOE for approval. Gary Holcomb, a DOE official who reviewed and recommended the estimate in July of 1988, testified that he considered the water disposal problems at 24Z and did not believe they were significant. Prior to the award of Celeron's contract, BPOI did not contact DOE specifically about revising the estimate in light of the problems experienced in September.

The 10,000 BOPD estimate in the IFB, issued on August 22, 1988, made no reference to water disposal problems at 24Z. Celeron entered into the contract in order to secure a reliable source of light crude for use in its

**2.** As a result of difficulties experienced at 24WD, Texaco, the purchaser that preceded Celeron at 24Z, was underdelivered by about 116,283 barrels through the course of its contract. The Texaco underdeliveries were due to the problems at 24WD, and the majority of the shortfall occurred in September.

Kern County blending operations. Celeron's operations are concentrated on the Celeron Gathering Line, a 16-inch proprietary pipeline with connections to 24Z and other oil fields in Kern County, California. Various grades of crude oil are pumped into Celeron's Gathering Line at different points, and the oil is blended as it moves towards the Pentland Station. At Pentland Station, the crude enters a shipping tank, to be routed into the All American Pipeline for shipment to destinations in West Texas and was eventually sold to customers. If Celeron was unable to blend the crude oil along its gathering line to a gravity high enough to meet the demands of its customers, Celeron would take light crude from reserves at Pentland and blend it with the incoming crude from Celeron's Gathering Line.[3]

In the regional market, suppliers, such as DOE, often contract to sell crude oil in the month prior to delivery. For planning purposes, DOE and other suppliers submit to their purchasers confirming "nominations" that indicate the volume and gravity of the crude expected to be available during the upcoming month. The nominations process, which begins roughly in the middle of the preceding month and culminates about five working days before the relevant month, gives purchasers an opportunity to assess their incoming supply and make necessary plans and adjustments, including the purchase of more oil of specific gravity if needed, for the upcoming month. During the nominations period, all available crude is usually committed. The spot market for crude oil in the region is the forward month.

### D.   *The Performance of Celeron's Contract*

The crude oil provided to Celeron at 24Z was substantially less than the contract's estimate during October, November, December 1988, and early January 1989. For the Octo- ber period, DOE nominated approximately 7500 BOPD for delivery to Celeron at 24Z.[4] Celeron received 73,877 barrels less than the 310,000 barrels estimated by the contract. In November, the nominated figure for 24Z was 8000 BOPD. Deliveries in November were short of the contract estimate by 49,802 barrels. In December, DOE nominated a daily delivery volume of 10,400 BOPD. Actual December deliveries, however, were short of the contract estimate by 113,000 barrels. In early January 1989, Celeron received 56,921 barrels less than the contract estimate.

After 24WD was foam cleaned on October 4, 1988, and the resin plug failure discovered, NPR operators tried to operate the well. However, 24WD performed dismally, even at high injection pressures. On October 14, 1988, NPR operators wrote in a program request that: "It has now become necessary to try to run the casing patch [as originally proposed]." Pl.Ex. 8 at 132. At this point, NPR operators knew that the 24WD could not produce reliably, if at all, until a casing patch repair was completed. NPR operators thought that they might be able to get the casing patch installed as early as mid-December, if everything went right and the necessary equipment became available for its installation. The court finds that this estimated time to patch 24WD was pure speculation. NPR operators knew the process was likely to take substantially longer. For example, the rig needed for the installation of the casing patch could be unavailable for over a month. In fact, the rig needed for installation was unavailable for a number of weeks, and the casing patches were not installed. The well was not returned to full service until mid-January 1989.

NPR operators foamed out the well again on October 28, 1988. The well accepted in-

---

3.  "Gravity" expressed as a number, indicates the viscosity, quality, and density of a particular crude. A higher gravity number expressed in degrees (30 or above) represents a light crude oil. A low gravity number (below 20) represents a heavy crude oil. Heavy crude (low gravity) would have to be blended with light crudes, such as 24Z crude which had a gravity rating of about 35 degrees API, in order to meet customer requirements. Moreover, Celeron needed to blend crude to at least a gravity of 27 degrees API in order to send the crude through the All American Pipeline.

4.  This figure was based on the testimony provided by Celeron's Allen Hebert, Manager of Operations. The court found Hebert to be a credible witness and believes that his memory regarding the nominations amount is accurate.

jection for approximately six days, and then failed completely in early November. Hal Owens, the production engineering supervisor with responsibility for the well, testified that prior to the October 28 foaming he thought "there was a chance maybe" that foaming could restore 24WD to a condition at which it could sustain injection for six months. At this time, however, any reliance on foam cleaning as a basis for operating 24WD, and thereby predicting normal delivery levels at 24Z, was unreasonable, as cross-examination and contemporaneous documentation revealed. In light of the well's failure on November 6, NPR operators decided to shut down the 24WD completely and wait for the long and uncertain casing repair process.

From mid-October through December 1988, DOE officials and NPR operators failed to give Celeron a candid assessment of the wastewater problem. At trial, Jerome Borgman, the head gauger for BPOI who was responsible for 24Z, testified that in August or September 1988 he told Celeron officials that there were water disposal problems at 24Z that were affecting delivery to the current buyer. The court finds that if this information was conveyed to Celeron, it was done in a cursory fashion that did not impart to Celeron the possibility of sustained underdeliveries through Celeron's contract term. Moreover, the court finds accurate the statement by Joseph Pfeifle, who supervised purchases for Celeron under the contract, that he was "absolutely not" aware of wastewater problems prior to the contract term. This is consistent with DOE's position that NPR operators believed that the wastewater problem was routine and capable of repair at this time.

About October 7, 1988, Pfeifle called Borgman to inquire about underdeliveries at 24Z. Borgman told Pfeifle that 24Z was experiencing wastewater difficulties which he expected would be taken care of in a couple of weeks. In November, Pfeifle again called Borgman regarding the underdeliveries. Borgman told Pfeifle that there were still problems with a wastewater disposal well and that he expected the problem to be fixed and that Celeron would get its crude oil. The court finds that neither Borgman nor any other DOE or BPOI official told Celeron that the on-site well was shut down and that repair work would not be completed until mid-December at the earliest.

In December, severe underdeliveries relative to the nomination occurred. Borgman again told Pfeifle in December he was working on the problem and that Celeron would get its crude oil. Borgman's assurances at the end of 1988 created the impression that full production could resume at any time.

The shortfalls in December depleted Celeron's inventory reserve of light crude oil. Pfeifle testified that during this period, Celeron had difficulties meeting many of its commitments, in both quantity and quality of crude oil, to its customers. According to Pfeifle, many of these commitments were on a fixed-price basis, and Celeron had to make up the shortfalls to its customers in later months.

In January 1989, Celeron learned that DOE was diverting raw crude oil production that normally flowed to 24Z to delivery location 18G, where it was processed and sold to other customers. DOE diverted this crude because it could not process it at 24Z in light of the breakdown of 24WD. This type of diversion, designed to sustain maximum production, was a normal practice at the NPR. In late January 1989, Celeron asked DOE to make up the underdeliveries by allowing Celeron to take additional oil at 18G. DOE agreed to allow Celeron to take oil at 18G, although this was not standard practice, and it was not required under the contract. Celeron was advised that it would have to pay the prices in effect at 18G. Pursuant to this arrangement, Celeron took what it understood to be "cover" from 18G during the months of February and March 1989.

Plaintiff received approximately 108,562 barrels of oil from 18G in February and 138,719 barrels in March 1989 for a total of 247,281 barrels. The price for Elk Hills oil at 35 degrees API in February was $16.053. The price for Elk Hills, 35 degrees API crude in March was $16.573. Celeron incurred additional charges associated with delivery at 18G of $28,239 in tariffs and pipeline loss allowances.

For 35 degrees API crude oil at 24Z, the court finds that Celeron paid $13.443 per barrel ("/b") in October 1988. In November, Celeron paid $12.253/b. In December, Celeron paid $11.693/b. In January 1989, Celeron paid $13.833/b. The court finds that the market price, adjusted to 35 degrees API gravity, for Belridge Light, a light crude in the NPR that was comparable to 24Z crude, was: October—$11.702/b; November—$11.633/b; December—$13.241/b; January 1989—$15.319/b. These figures establish that the contract price was above market in October and November 1988, and below market in December 1988 and January 1989.

Based on the testimony and report of Matthew Talbot, defendant's damages expert, the court finds that on the direct sale and exchange of Elk Hills crude, Celeron made a profit of $1.26/b in February and $.69/b in March, for a weighted average of $.94/b during the overdeliveries.

## DISCUSSION

### A. *Liability*

■ The contract plainly disclaimed all warranties and representations regarding the 10,000 BOPD estimate at 24Z. The contract further provided that the amount delivered under the contract could deviate from the estimate should there be difficulties in field operations. Pl.Ex. 1, Sec. B.004(a), p. 8. The malfunction of 24WD was such an operational problem. Celeron has no claim regarding the deviation of the contract estimate based on a warranty or a guaranty of quantity. *See Clearwater Forest Industries, Inc. v. United States,* 227 Ct.Cl. 386, 395, 650 F.2d 233 (1981).

Nevertheless, the contract and the IFB stated that the estimate was the government's best estimate. The parties bargained for the plaintiff to receive a steady supply of oil and defendant to get a reliable purchaser for its production. Both parties were sophisticated in the business of crude processing and sales. The parties knew that production fluctuation and advance planning were significant in this market, as both the nominations process and the use of a "best estimate" demonstrate.

■ Even where a contract disclaims all warranties or guarantees, the government is under a duty to fashion material estimates with reasonable care. *See Medart v. Austin,* 967 F.2d 579, 581 (Fed.Cir.1992); *Womack v. United States,* 182 Ct.Cl. 399, 412–13, 389 F.2d 793 (1968). There was information available to DOE that indicated that well 24WD had a history of problems. NPR operators found large holes in the well liner in December of 1987. 24WD also had to be foam cleaned at least three times between late December 1987 and February 1988. After this series of foam cleanings, however, 24WD did experience a period of sustained injection until the July 1988 breakdown. NPR operators also thought there was a fair chance that the phenolic resin plug could repair the well before the start of Celeron's contract. As a result, the court holds that the estimate, at the commencement of Celeron's contract did not constitute a breach of DOE's duty to provide a best estimate.

■ In light of this finding, the court further holds that government did not breach its duty to disclose superior knowledge, as of the date of contract commencement. This implied duty is breached when

(1) the Government possesses knowledge of vital facts regarding a solicitation or contract, (2) the contractor neither knows nor should have known of the facts, by contract specification or otherwise, (3) the Government knew or should have known the contractor's ignorance of the facts, and (4) the Government fails to disclose the facts to the contractor.

*Miller Elevator Co., Inc. v. United States,* 30 Fed.Cl. 662, 675 (1994), *appeal dismissed,* 36 F.3d 1111 (Fed.Cir.1994). On October 1, 1988, the government did not know that 24WD would be unable to reliably sustain injection through the contract term. Therefore, the first prong of the test was not met at that time.

■ Celeron has advanced a number of theories upon which to predicate liability. Foremost, it is established that the parties to a government contract are bound by an implied duty of good faith and fair dealing. *See Miller Elevator,* 30 Fed.Cl. at 674; *Bradley*

*Const., Inc. v. United States,* 30 Fed.Cl. 507, 511 (1994); *Walter Dawgie Ski Corp. v. United States,* 30 Fed.Cl. 115, 130 (1993). The concept of fair dealing places on the government a duty to render reasonable co-operation to the contractor in the performance of the contract and an additional duty not to hinder the contractor's performance. *Walter Dawgie,* 30 Fed.Cl. at 130. A claim under the duty of cooperation concerns the reasonableness of the government's actions after considering the facts and circumstances at the time. *Bradley,* 30 Fed.Cl. at 511; *Walter Dawgie,* 30 Fed.Cl. at 130; *see Commerce International Co. v. United States,* 167 Ct.Cl. 529, 535–36, 338 F.2d 81 (1964).

■ The status and outlook for well 24WD took a significant step backward, however, after the phenolic resin plug repair resoundingly failed, as was discovered in early October. It is clear to the court that the government acted in an unreasonable and irrational manner after its October discovery that the phenolic resin plug had failed. After an October 4 foam cleaning, the well continued to perform poorly. Hal Owens' testimony that the NPR operators believed that the well might become reliable at this point through foam cleaning was unconvincing. By mid-October, if not earlier, any hope that a regime of foam cleaning could maintain reliable injection was without basis. By October 15,[5] NPR operators knew that the well was unlikely to take sustained injection unless the casing patch repair succeeded.

The government failed to candidly disclose to Celeron the nature and implications of the wastewater disposal breakdown. The discussions between Borgman and Celeron personnel gave Celeron no reason to believe that the well would be shut down until at least mid-December, and probably longer. DOE and its NPR operators had exclusive knowledge and control over the production and processing of crude oil at 24Z. Celeron had no means of evaluating processing problems other than by what they were told by the government. The government understood that, under the contract, a steady supply of

crude oil was important, and that Celeron had no control over production. The government's failure to give Celeron an accurate, non-evasive assessment of the wastewater disposal problems in mid-October and thereafter, constituted a breach of the government's duty of fair dealing. Whether framed as a failure to cooperate, a failure to disclose later superior knowledge, or even a failure to update an estimate, the government's conduct was simply unjustifiable.

**B. Damages**

■ The plaintiff has the burden of proving that it was injured by the defendant's actions. *River Const. Corp. v. United States,* 159 Ct.Cl. 254, 270–71, 1962 WL 9302 (1962). There is a distinction between proof of injury and proof of amount. For proof of injury, "acceptable evidence [must] demonstrate[ ] that the damages claimed resulted from and were caused by the breach." *Boyajian v. United States,* 191 Ct.Cl. 233, 239, 423 F.2d 1231 (1970). For proof of the amount of damages, the plaintiff must "furnish[ ] a reasonable basis for computation even if it is approximate." *Transtechnology Corp. v. United States,* 22 Cl.Ct. 349, 362 (1990). In extreme cases, a jury verdict method can be used for determining quantum when "there is no more reliable method for computing damages." *Dawco Const., Inc. v. United States,* 930 F.2d 872, 880 (Fed.Cir. 1991) (equitable adjustment case), *overruled on other grounds, Reflectone, Inc. v. Dalton,* 60 F.3d 1572 (Fed.Cir.1995). In damage awards, the goal is to compensate the injured party so that it is placed in the same position as it would have occupied after full performance of the contract. *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 875, 524 F.2d 707 (1975), *cert. denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976).

■ The government did not guarantee that Celeron would receive 10,000 BOPD. Instead, the injury Celeron suffered was a drain on its inventory and reserves caused by a lack of information. If the government had complied with its duty of fair dealing, Celer-

---

**5.** In addition, on November 6 the well plugged after the October 27 foam cleaning attempt. At this point the well was essentially shut down pending the casing patch repair. Owens admitted that the NPR operators knew that would have to wait for major repair work.

on would have been able to plan for delivery shortfalls due to the breakdown of 24WD. It is this loss that must be remedied. With that in mind, the court analyzes each month of underdeliveries in relation to the corresponding information received by Celeron.

In October, Celeron was underdelivered by 73,877 barrels. However, DOE nominated only 7500 BOPD for October. Therefore, Celeron was on notice that it would not receive the contractual amount and could have sought alternative sources of light crude. In addition, the market price in November and December for comparable Belridge Light crude which Celeron may have been able to secure as cover was less than Celeron's October contract price. Therefore, the plaintiff proved no injury in October 1988.

Similarly, in November 1988, Celeron was underdelivered by 49,802 barrels, a shortfall within the scope of the 8000 BOPD nominated by DOE. Celeron has argued, however, that it did not seek cover because of various assurances by Borgman. Indeed, during the underdeliveries, Borgman consistently conveyed the impression that the well problems would be fixed within a short time. However, there is no evidence that Borgman modified the nominated amount or that Celeron should have understood its conversations with Borgman as a modification of the nominated figure. In light of the nomination, Celeron should have been making plans for the November shortfall in October. Furthermore, Celeron has not shown that it suffered any substantial injury for this month. In addition, the evidence does not establish that Celeron suffered any heavy draw down from its inventory during this period.

In December 1988, DOE nominated 10,400 BOPD. At the same time, NPR operators gave no indication of the severity of the repair process or the fact that the speed of the casing patch installation was the product of chance. Celeron was substantially under-

delivered by 113,000 barrels at 24Z in December. This unexpected lack of light crude oil flowing into the Celeron Gathering Line, and later into Pentland Station, substantially disrupted Celeron's normal operations.

The government's breach of the duty of fair dealing caused Celeron's injury. The court finds that, as the December shortfall of light crude unfolded, Celeron was forced to take light crude from its reserve tanks at the Pentland station in order to meet the quality and quantity requirements of its customers. After considering both the testimony of Celeron officials and defendant's expert, the court finds the testimony [6] of Celeron officials regarding the December 1988 disruption to its operation and the draw down from its reserves to be credible. The light crude oil taken out of Celeron's system to compensate for the unexpected shortfall of 113,000 barrels had to be replaced.

Celeron replaced the light crude oil lost from its system by requesting and receiving additional production at delivery location 18G. Both parties understood that the additional February and March barrels were "make-ups" for the prior, 24Z shortfalls. Celeron was underdelivered by 113,000 barrels in December. In February 1989, Celeron received 108,562 barrels from 18G. The difference between the February and December price for Elk Hills crude at 35 degrees API is $4.36, and the difference between the March and December price is $4.88. As the December shortfalls accumulated, Celeron probably could have secured light crude oil on the spot market in January 1989. However, taking oil from 18G in February and early March 1989 represented a reasonable means of covering the light crude taken out of Celeron's system because of the unanticipated December shortfall. In any event, the posted price for Belridge Light in January, adding a spot market premium of 50 cents to $1.00 a barrel, is comparable to the February

6. The defendant argues that Celeron has failed to prove damages. However, the court found Celeron's testimony to be reliable, and believes that Celeron was scrambling to keep its operations running effectively in December because of the light crude shortfall. This crude was needed not only to meet gravity requirements to customers, but also to meet the shipping requirement of 27 degrees API for use of the All American Pipeline. Evidence at trial suggests that the trading, blending and reselling of raw crude in Kern County is an intense and rapidly-paced business, and the court does believe that it is unusual that Celeron, a young company, failed to keep detailed records while operating in this market in late 1988.

and March Elk Hills price. Thus, the short-fall multiplied by the price differential between December and February totals $473,-330 ($4.36 multiplied by 108,562 barrels). Also, the shortfall multiplied by the price differential between December and March 1989 totals $21,657 ($4.88 × 113,000 − 108,-562). Therefore, the total damages for the shortfall of 113,000 barrels of oil is $494,987.

Celeron has also claimed that it suffered injuries related to the underdeliveries in early January 1989. Celeron, however, presented no evidence regarding nominations for this period. Celeron has not proved damages for this period. Furthermore, the court believes that the shock to both Celeron's system and its inventory occurred in December.

There remain the additional make-up deliveries in March 1989. These deliveries at 18G were intended and understood by the parties as compensation for DOE's earlier underdeliveries. As determined above, Celeron was injured only to the extent of 113,-000 barrels. Therefore, the court believes that it is appropriate to account for the value of this surplus oil given by DOE to Celeron in computing Celeron's damages. Extra barrels of Elk Hills · oil had a value, in gross profit terms, to Celeron of approximately $1.26 in February and $.69 in March. Although the figures used in this calculation may not be perfect, the court believes that they are the most reliable available in the record. Using the February and a small part of the March 1989 barrels as replacement cover, the extra March barrels not used as replacement cover had a value of $92,654 (247,281 barrels—113,000 barrels × $.69/b). Subtracting this number from Celeron's base damages figure of $494,987 leaves $402,333. Adding $28,239 in tariffs and pipeline loss allowances for crude oil delivered at 18G, entitles Celeron to $430,572 in damages plus interest from the date the contracting officer received the claim, pursuant to the Contract Disputes Act, 41 U.S.C. § 611.

## CONCLUSION

For the foregoing reasons, the court holds that plaintiff is entitled to $430,572 plus interest from the date the contracting officer

received the claim. The parties shall submit to the court by February 23, 1996, the date the contracting officer received the claim. Thereafter, the clerk shall enter judgment accordingly. No costs.