D.F.K. ENTERPRISES, INC. d/b/a
American Coatings, a California
corporation, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 96–423C.

United States Court of Federal Claims.

Nov. 22, 1999.

Richard D. Corona, San Diego, California, for plaintiff.

Karin M. Norington, Washington, D.C., appeared for defendant with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, Assistant Director Kirk T. Manhardt, United States Department of Justice, Washington, D.C.

## OPINION

BRUGGINK, Judge.

This dispute arises out of a contract between plaintiff, D.F.K. Construction Corporation ("DFK"), and the Army Corps of Engineers ("Corps"), for the painting of water storage tanks located at the White Sands Missile Range ("WSMR") in White Sands, New Mexico. In its complaint, DFK alleges that the Corps breached the contract by misrepresenting the amount of adverse weather experienced at the site, which in turn resulted in unanticipated work stoppages and corresponding increases in the overhead costs incurred by DFK over the course of contract performance. Plaintiff seeks damages for breach of contract stemming from its reliance on this alleged misrepresentation. The matter is currently pending on the parties' cross-motions for summary judgment. Oral argument was held on April 28, 1999, during which the court ordered supplemental briefing. For the following reasons, the motions for summary judgment of both parties are denied.

## BACKGROUND

On July 29, 1994, the Corps issued Solicitation No. DACA63–94–B–0107 for the painting of four ground level and three elevated steel water storage tanks at WSMR.[1] The

---

1. The painting of one elevated tank was subsequently deleted by contract modification.

scope of work included, among other activities, the construction of a containment system around the tanks to prevent contamination from lead-based paint from entering the surrounding environment during the paint removal process.

The containment system specified in the solicitation consisted of large nylon reinforced tarps tied together and anchored with ropes and/or cables, extending the entire height of the tank (140 to 180 feet). Although this type of containment system is effective at confining pollutants, one of its drawbacks is that high winds can cause the tarps to tear, rendering the containment system useless. Work under the contract was thus dependent on favorable wind conditions.

On June 1, 1994, prior to award of the contract, the Corps issued a formal response to questions raised at the pre-bid conference. One of the questions dealt with the weather conditions:

Question 12: What is the normal wind speed at the job site?

Response: Contact the U.S. Weather Service in El Paso at (915) 772–8894.

Plaintiff did not contact the U.S. Weather Service prior to bidding on this project. Although DFK is headquartered in California, the President of DFK, David F. Kappos, states in his affidavit that he performed a pre-bid site visit to WSMR in July of 1994, along with two Corps representatives. According to Kappos, it was very hot on the day of his visit and there was very little wind. Kappos states that when he asked about the expected weather conditions at the site, one of the Corps representatives responded, "it's hot and we get some winds occasionally."

The solicitation provided prospective bidders with the following information with respect to anticipated adverse weather for the project period:

SECTION 00800—SPECIAL CLAUSES

. . . .

3. TIME EXTENSIONS FOR UNUSUALLY SEVERE WEATHER (OCT 1989) (ER 415–1–15)

. . . .

b. The following schedule of monthly anticipated adverse weather delays is based on the National Oceanic and Atmospheric Administration ("NOAA") or similar data for the project location and will constitute the base line for monthly weather time evaluations. The contractor's progress schedule must reflect these anticipated adverse weather delays in all weather dependent activities.

MONTHLY ANTICIPATED ADVERSE WEATHER DELAY
WORK DAYS BASED ON (5) DAY WORK WEEK

| JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 5 | 5 | 3 | 1 | 2 | 3 | 6 | 5 | 4 | 3 | 3 | 8 |

Engineering Regulation ("ER") 415–1–15, referenced in the title of Paragraph 3 above, was issued by Corps Headquarters to provide guidance to Corps engineers for establishing time adjustments to the contract for delays caused by unusually severe weather. According to this document, unusually severe weather includes "weather that is more severe than the adverse weather anticipated for the season or location involved."

Appendix "B" to ER 415–1–15 sets forth the methodology that Corps engineers are to use in developing the adverse weather projections for the project location:

1. *Development of Adverse Weather Data. . . .*

a. Analyze the project scope and site geography to determine which weather parameters (temperature, precipitation, *wind*, etc.) are applicable. The parameters selected should present adverse conditions that could potentially delay construction activities.

b. Review the technical specifications to determine the numerical values that will be assigned to each parameter in order to establish the anticipated adverse weather....

c. Compile the number of days per month that the anticipated weather is expected to be adverse by analysis of NOAA or other weather data. When at all possible, the last 10 years of consecutive data should be used to establish the baseline.

. . . .

2. *Application of Adverse Weather Data to Performance Time Estimates....*

. . . .

(2) Incorporation of anticipated delays due to weather will change individual activity durations and progressively shift the preliminary schedule and move weather dependent activities into or out of unfavorable conditions.

(Emphasis added).

The Corps internal guidance, in other words, directed that wind be considered a potential source of adverse weather delay. Nevertheless, in preparing the anticipated adverse weather chart for this project, the Corps included only adverse weather caused by rain and/or freezing precipitation. It did not include anticipated delay caused by adverse wind conditions. Kappos states in his affidavit, however, that DFK based its bid on the assumption that the weather chart in the solicitation included anticipated delays for all types of adverse weather. It thus did not include costs in its bid associated with the extended periods of high wind that actually prevail at the contract work site.

On June 29, 1994, the Corps awarded Contract No. DACA63–94–C–0156 to DFK in the amount of $991,300. Shortly thereafter, DFK submitted a Proposed Schedule of Work as required by the contract. This schedule incorporated the contract requirement that only one tank could be out of service at any one time. As shown on that schedule, DFK intended to begin painting the ground tanks the week of October 21, 1994 through the week of February 10, 1995. Next, DFK planned to paint the elevated tanks from the week of February 10, 1995 through the week of June 2, 1995. According to Kappos, DFK planned to paint the ground level tanks first because they were close together and would allow DFK to group its equipment and materials in one area and get a good jump on the work. Kappos states that in preparing this schedule, DFK relied on the anticipated adverse weather data included in the contract.

Beginning approximately March 13, 1995, the project site began to experience a series of high wind days. These winds began to rip tarps, diminishing the effectiveness of the containment systems, and causing unsafe working conditions. Because of these conditions, DFK was forced to temporarily cease its paint removal operations until the winds subsided. Over the next several weeks, plaintiff repaired damaged tarps and remobilized to areas of the project less affected by the wind.

In a letter dated May 17, 1995, DFK advised the Contracting Officer ("CO"), Dirk Decker, that the consistent high winds had created unsafe working conditions and repeatedly damaged the contractor's tarp containment system. The letter was sent, in part, to formalize a verbal agreement between the Corps and DFK to stop work until the high winds ended. In the letter, DFK advised the CO that it would submit a request for a time extension once the total delay was known. Additionally, DFK informed the Corps that it considered the high winds to be a differing site condition.

On May 25, 1995 DFK wrote a letter to the CO requesting a contract modification for the additional costs incurred due to the wind conditions at the base. In the letter, DFK wrote that it had been advised by Corps personnel that it was normal for the high winds at the range to last from February through May or later. DFK concluded the letter by requesting seasonal wind information for the five years prior to contract award.

The CO responded to DFK's modification request on June 6, 1995. He wrote that the differing site conditions clause incorporated into the contract was not applicable to "acts of God", i.e., weather. With respect to DFK's weather data request, the CO wrote

that the wind information would be supplied as soon as possible.

The following day the CO wrote to DFK asking when DFK intended to return to the job site. DFK responded in a letter dated June 12, 1995, that it would return to the project site when the winds abated for a period of seven to ten days. It anticipated that it would return to the site on June 19, 1995. DFK returned to the site in late June.

On July 25, 1995, the CO issued Contract Modification No. P00005. The modification extended the contract completion date by 82 calendar days for delays caused by weather in excess of delays anticipated in the contract.

On November 21, 1995, plaintiff submitted a claim to the CO in the amount of $209,870 for additional direct and indirect costs resulting from alleged defective plans and specifications. DFK asserted that the plans and specification were defective because they inaccurately set forth the anticipated weather delays. DFK also alleged that the Corps failed to disclose its superior knowledge of "actual adverse weather conditions at the project site." On May 15, 1996, the CO issued a decision denying DFK's claim in its entirety. The CO found: 1) the plans and specification were not defective because the adverse weather data is not considered part of the specifications which address the performance of the work; 2) information about the weather conditions at WSMR was available to the contractor prior to contract award; 3) the weather conditions at WSMR during the project were unusually severe, entitling DFK only to a non-compensable time extension; and 4) DFK was not required to perform work beyond the contract requirements. On July 17, 1996, DFK filed its complaint in this court.

In its original motion, DFK advanced a wide array of theories, including: differing site condition, defective specifications, superior knowledge, breach of warranty, changes to the scope of the contract, and misrepresentation. In its supplemental brief following oral argument, however, plaintiff concedes that neither the Default Clause, nor the Differing Site Condition Clause, nor any of the other Federal Acquisition Regulations ("FAR")

clauses included in the contract, provide for recovery under the circumstances here. Instead, DFK has narrowed its arguments to the theory that the anticipated adverse weather data in the contract is an affirmative representation as to prior conditions upon which DFK reasonably relied; that consistent high winds are a predictable phenomenon at the WSMR; that it was not aware of this phenomenon; that the Corps' failure to incorporate known potential delays due to high winds constitutes a misrepresentation amounting to a breach of contract; and that DFK suffered damages as a result of reliance on this misrepresentation.

## DISCUSSION

### Jurisdiction

■ DFK's misrepresentation claim raises a potential jurisdictional issue. The Tucker Act expressly excludes from the Court of Federal Claims' jurisdiction cases "sounding in tort." *See* 28 U.S.C. § 1491(a)(1). This Court's predecessor, the Court of Claims, relying on the Supreme Court's decision in *United States v. Neustadt,* 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961), determined that claims "sounding in tort" include those "'based on negligent misrepresentation, wrongful inducement, or the careless performance of a duty allegedly owed.'" *Aetna Casualty & Surety Co. v. United States,* 228 Ct.Cl. 146, 164, 655 F.2d 1047, 1059 (1981); *see also Dakota Tribal Industries v. United States,* 34 Fed.Cl. 295, 297 (1995). The Court has repeatedly asserted jurisdiction, however, over claims based on 'tortious breach' of a government contract. *See Summit Contractors, Inc. v. United States,* 22 Cl.Ct. 54, 56 (1990) (citations omitted). The relevant inquiry is whether there is a nexus between the alleged tortious conduct and some alleged contractual obligation. *See Joseph W. Morris v. United States,* 33 Fed.Cl. 733, 742 (1995). Where a valid contract is alleged, "the fact that the alleged breach is also tortious does not foreclose Tucker Act jurisdiction." *Wood v. United States,* 961 F.2d 195, 198 (Fed.Cir.1992) (citation omitted).

■ Here, DFK argues that the alleged misrepresentation constitutes a breach of contract because it violates the "implied warranty of the accuracy of contract documents." *See* Pl.'s Opp. to Def.'s Motion for Summary Judgment and Pl.'s Cross–Motion for Summary Adjudication of Issues at 13. DFK's claim is entirely dependent on the existence of a contract between it and the Corps, and the core of the dispute revolves around competing interpretations of contract documents. DFK's claim is in substance a claim for breach of contract by misrepresentation, or negligence, or both. The court has jurisdiction over such claims. *See, e.g., Summit Timber Co. v. United States*, 230 Ct.Cl. 434, 440–41, 677 F.2d 852, 856 (1982) (allowing action where contract documents allegedly contained "erroneous factual representations"); *Chris Berg, Inc. v. United States*, 186 Ct.Cl. 389, 404 F.2d 364 (1968) (exercising jurisdiction where contractor alleged that government made misleading statements concerning anticipated weather at the job site); *Badgley v. United States*, 31 Fed.Cl. 508, 514 (1994) (claim asserting misrepresentation based on documents incorporated into the contract is "in substance" a claim for breach of contract, and "subject matter jurisdiction exists under the Tucker Act even if tortious elements also exist.").

### *Liability*

#### A. Undisputed Facts and Issues Presented

The parties agree on several key facts. It is undisputed that the anticipated adverse weather data in the contract did not factor in the possibility of delays due to wind. It is also undisputed that the job site experienced significant winds during the course of DFK's performance, and that, but for these adverse wind conditions, DFK would have finished the work during the contract period. With these facts in mind, the following issues must be considered by the court: (1) whether the weather chart in the contract constituted an affirmative representation on which DFK could reasonably rely; (2) if the chart is a representation, whether DFK actually relied on it, and whether such reliance damaged DFK; (3) whether the contract clause dis-

claiming government liability for contractors' interpretations of government data is a bar to DFK's recovery; (4) whether the Site Inspection clause in the contract placed an affirmative duty on DFK to make its own investigation and satisfy itself about the possibility of wind delays on the job site; and (5) if the Site Inspection clause did impose such a duty, whether DFK's efforts to check into wind conditions at WSMR prior to award constituted a satisfactory independent investigation.

#### B. Analysis

■ The government impliedly warrants the accuracy of matters set forth in contract documents. *See United States v. Spearin*, 248 U.S. 132, 137, 39 S.Ct. 59, 63 L.Ed. 166 (1918). "Misrepresentation occurs when the government misleads a contractor by a negligently untrue representation of fact, or fails to disclose information it has a duty to disclose." *Meyers Companies, Inc. v. United States*, 41 Fed.Cl. 303, 311 (1998) (quoting *John Massman Contracting Co. v. United States*, 23 Cl.Ct. 24, 31 (1991)). Without some valid basis for a contrary conclusion, (e.g., an absence of detrimental reliance by a government contractor, or a failure to investigate sources which would have revealed the truth), the government "is liable for damage attributable to misstatements of fact (in a contract or specifications) which are representations made to the contractor." *See Summit Timber Co. v. United States*, 230 Ct. Cl. 434, 677 F.2d 852, 857 (1982) (quoting *Flippin Materials Co. v. United States*, 160 Ct.Cl. 357, 312 F.2d 408, 413 (1963)). Furthermore, there is no scienter requirement associated with a claim for breach of contract by misrepresentation. *See Womack v. United States*, 182 Ct.Cl. 399, 389 F.2d 793, 800 (1968) (per curiam) ("Whatever the case in tort or other areas, intent to mislead is not an essential element of actionable misrepresentation in the breach of contract context."). A positive but erroneous representation in a contract is not rendered innocuous merely because it was due to negligence or inadvertence, rather than to bad faith or gross error. *See*

*Summit Timber Co.,* 677 F.2d at 857; *Morrison–Knudsen Co. v. United States,* 170 Ct.Cl. 712, 345 F.2d 535, 539 (1965).

■ DFK argues that the weather chart constituted a misrepresentation amounting to a breach of contract by the government. The government's first line of defense is the claim that "[t]he contract neither expressly warranted nor affirmatively represented information regarding wind conditions or even delays to the contractor." *See* Def.'s Reply Brief at 11. It is true that the contract did not expressly warrant that DFK would or would not encounter certain wind conditions, or that actual delays would correspond to the anticipated delays noted in the weather chart. It is well established that no implied warranty is made as to future weather. *See Turnkey Enterprises, Inc. v. United States,* 220 Ct.Cl. 179, 597 F.2d 750, 754 (1979); *Hardeman–Monier–Hutcherson v. United States,* 198 Ct.Cl. 472, 458 F.2d 1364, 1370–71 (1972); *Arundel Corp. v. United States,* 103 Ct.Cl. 688, 711–12 (1945). Merely because the weather chart did not involve an express warranty of future weather, however, does not mean that it is not an affirmative representation relating to prevailing wind conditions at the job site.

As DFK's counsel made clear during oral argument, the basis for DFK's misrepresentation claim is that the chart purported to describe *"Anticipated Adverse Weather Delays"* (emphasis added). *See* Oral Arg.Tr., April 28, 1999, at 13–16. DFK argues that the use of the term "anticipated" communicated to offerors that the data in the chart was in fact based on a reasonable empirical evaluation of past weather conditions at the job site. DFK contends that in turn, its risk assessment and bid amount were affected by its belief that the government's estimate of anticipated weather delays had empirical backing, and that it did not include a contingency to cover extra costs relating to the extensive delays that would in fact be caused by the normal wind conditions at the job site.

The government objects to DFK's interpretation, arguing that the plain language of the contract indicates that the chart is meant to serve only as a "baseline" for anticipated weather delay days, and thus is not a affirmative representation. It argues that the

contract does not state that the anticipated weather delay days were based upon historical or actual weather data. The government contends that DFK's reading of the chart depends on a series of inferences that are not justified by the specific language of the contract, and that under Clause 78(b) of the contract, the government is not liable "for any conclusions or interpretations made by the Contractor based on the information made available by the government." *See* Def.'s Supp. Brief at 3.

The court agrees with DFK's reading of the chart, and finds that the weather chart is an affirmative representation of past weather conditions at the job site. The inclusion of the term "anticipated" in the in the chart's title implies that the government has undertaken some analysis to determine the usual weather at the job site, and is presenting the chart as a contrast between the usual weather delays, which should be accounted for in the contractor's bid, and unusual delays, which will be dealt with by granting the contractor a time extension under the Default Clause. *See Berger v. Pierce,* 933 F.2d 393, 399 (6th Cir.1991) (finding that reference to "anticipated cyclical levels" of water currents in a federal flood insurance policy was intended to distinguish between usual and unusual weather events). This representation was inaccurate, however, because the government ignored wind conditions at the job site when formulating its chart purporting to represent the "monthly anticipated adverse weather delays based on a five day work week."

The contract states explicitly that "The following schedule of monthly anticipated adverse weather delays is based on National Oceanic and Atmospheric Administration (NOAA) or similar data *for the project location* [.]" (emphasis added). The fact that different numbers of anticipated delay days were listed for different months would lead offerors to believe that the government had actually analyzed the weather at the job site, and assigned different numbers of delay days for different times of the year, depending on the usual prevailing local weather conditions.

The chart is not merely a mathematical formula, in other words, for determining automatic delay days. The form and phrasing of the chart permit the bidders to draw reasonable inferences as to affirmative representations. Contract terms are to be given their plain and ordinary meaning, and the court construes the meaning of terms as would a reasonably intelligent person acquainted with the contemporaneous circumstances. *See Aleman Food Servs., Inc. v. United States,* 994 F.2d 819, 822 (Fed.Cir. 1993); *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 351 F.2d 972, 975 (1965). A reasonable person viewing the title of the chart, and noting the variation in the number of days of delay, represented as having been determined based on NOAA weather data, would naturally believe that anticipated delays due to adverse "weather" included delays due to wind. The failure to consider the potential for delays caused by wind, therefore, caused the chart to be misleading to offerors. Contract terms susceptible to a misleading reading or implication subject the government to liability when a contractor misled by the term suffers injury. *See Spearin,* 248 U.S. at 137, 39 S.Ct. 59; *Helene Curtis Industries, Inc. v. United States,* 160 Ct.Cl. 437, 312 F.2d 774, 778 (1963); *Railroad Waterproofing Corp. v. United States,* 133 Ct.Cl. 911, 915, 137 F.Supp. 713, 716 (1956).

Under the government's reading, the numbers in the chart could have been completely arbitrary. This is not a fair reading of a chart entitled "anticipated adverse weather delays," and we do not think that offerors can be faulted for having viewed the chart as something more than an entirely arbitrary set of numbers chosen by the government and assigned randomly to different months of the year, with, as the government puts it, no connection to "historical or actual weather data." *See Cedar Lumber, Inc. v. United States,* 5 Cl.Ct. 539, 545 (1984) ("Ordinarily, estimates incorporated in a contract are not totally meaningless[,] as this would run counter to the basic principle of contract construction that no provision of a contract should be construed as mere surplusage."); *see also McGrew Bros. Sawmill, Inc. v. Unit-*

*ed States,* 224 Ct.Cl. 740, 745, 1980 WL 13236 (1980).

Although DFK and the other offerors had no right to assume that the actual weather in the future would correspond to the data on the chart, they did have the right to assume that the chart was actually based on the relevant prior weather data. The inclusion of the weather chart thus served to persuade offerors that, based upon the historical data, the risk of encountering extensive additional weather delays, while always a possibility, was not very likely, and that offerors should calculate their prices accordingly. In such cases, the government may be held liable for its failure to consider the relevant information and incorporate it into the estimate on which offerors rely.

The Court of Claims' decision in *Womack* is instructive on this point:

> An estimate as to a material matter in a bidding invitation is an expedient. Ordinarily it is only used where there is a recognized need for guidance to bidders on a particular point but specific information is not reasonably available. Intrinsically, the estimate that is made in such circumstances must be the product of such relevant underlying information as is available to the author of the invitation. If the bidder were not entitled to so regard it, its inclusion in the invitation would be surplusage at best or deception at worst. Assuming that the bidder acts reasonably, he is entitled to rely on Government estimates as representing honest and informed conclusions. In short, in promulgating an estimate for bidding-invitation purposes, the Government is not required to be clairvoyant[,] but it is obliged to base that estimate on all relevant information that is reasonably available to it. *Womack,* 389 F.2d at 801 (citations omitted).

The reasoning set forth in *Womack* supports DFK's claim here. This case is thus distinct from prior decisions that have held that adverse weather can never be a differing site condition. *See, e.g., Turnkey Enterprises, Inc.,* 597 F.2d at 754; *Hardeman–Monier–Hutcherson,* 458 F.2d at 1370–71 (listing cases). Those cases hold that the government cannot be responsible for accurately

predicting future adverse weather. They do not deal with situations where the government represents that its estimate is based on a study of relevant prior weather data.

 The weather chart thus constituted an affirmative representation as to past weather conditions. We now turn to the issue of whether DFK actually relied on the chart, and whether this reliance resulted in damages. The government argues that the deposition testimony of David Kappos, president of DFK, demonstrates that the data provided in the adverse weather chart was not factored into DFK's bid. Mr. Kappos testified as follows:

Q. In bidding this project, did you feel that the number of adverse weather delay days set forth in the table on page 800–3 was a guarantee that you would not incur any more adverse weather [than was] set forth in the table?

A. I don't think anybody can say that you can guarantee it, but I certainly relied on it.

Q. In what manner did you rely upon the table shown on page 00800–3?

A. I don't think we actually spell out an allowance. Our bids are not that detailed.

Q. You said you relied upon this table. Can you explain to me in what manner in preparing your bid that you relied upon the table?

A. Well, I think the reliance was on our progress schedule.

* * *

Q. You felt that it was the reliance that factored into the schedule. My question is how is the reliance factored into your progress schedule?

A. We assumed that we could meet your progress schedule.

Q. How was that assumption based upon the monthly weather table shown in 800–3?

A. Because I didn't see anything in there that would indicate any unusual bad weather.

Q. In bidding the project, did you understand that the table on page 800–3 showed anticipated adverse weather?

A. I read it. I understood what it said, yes.

Q. In bidding the project, did you consider that the actual bad weather might exceed the number of days shown in this table?

A. I had no reason to.

See Def's Motion for S.J., App. at 68–69.

Taken as a whole, the court finds that this testimony supports DFK's claim that it relied on the weather chart to its detriment in preparing its bid. Mr. Kappos testified that while he did not regard the chart as a guaranty of future weather conditions, he did view it as establishing a probability that the job site was not a place that would, under normal weather conditions, be subject to delays far in excess of those included in the chart. Mr. Kappos further testified that DFK relied on this belief when preparing its bid, because this belief led DFK to submit its bid while under the impression that it could meet a particular progress schedule. In fact, however, the typical high winds experienced at the site would make completion of the work in accordance with the proposed progress schedule highly problematic. Plaintiff has put forward evidence, in sum, that it relied on the chart to estimate weather delays at the job site, "without any contingencies for additional costs that would be incurred as a result of extended delays or additional expenses caused by sustained periods of high winds or other adverse weather." Pl.'s App. at 191.

Inclusion of the chart affected DFK's risk assessment in connection with the likelihood of extended weather related delays. Such risk assessment, in the course of a procurement, inevitably affects the amount of the parties' bids. See Appeal of PK Contractors, Inc., ENGBCA No. 4901, 92–1 B.C.A. (CCH) ¶ 24583 (1991) (finding that inaccurate Government data on historical river flow rates in a fish-hatchery contract inevitably resulted in underbidding by offerors, because they did not include a contingency to cover the higher costs of delayed performance caused by the actual flow rates); Cole's Construction, 96–2

B.C.A. (CCH) ¶ 28,579 (1996) ("Cole's agreed to the contract containing [an identical weather chart] based on use of the NOAA forecast data ... [I]f it had been based on [other] data ... Cole's would have accounted for 113 more anticipated adverse rain days of overhead costs for delay in its price estimate"). The evidence is sufficient to create a fact issue as to whether DFK's bid would have been higher if the government had considered data relating to possible wind delays when formulating the weather chart.

The government also points to sub-section (b) of Clause 78 of the contract, the Site Inspection Clause, which states that "the Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the Government." The government argues that DFK's claim regarding the weather chart is dependent on a series of inferences drawn by DFK from the information provided in the chart, and that the contract language in clause 78 specifically forecloses imposition of liability on the government for damages incurred when such inferences are inaccurate.

 In evaluating the effect of the disclaimer clause, the court is cognizant of the principle that a contract should be construed most strongly against the drafter, in this case, the United States. *See United States v. Seckinger*, 397 U.S. 203, 210, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970). Moreover, broad exculpatory clauses in contracts are generally disfavored. *See Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 91, 75 S.Ct. 629, 99 L.Ed. 911 (1955); *U.S. Industries v. Blake Construction Co.*, 671 F.2d 539, 544 (D.C.Cir.1982); *Texasgulf, Inc. v. United Gas Pipe Line Company*, 610 F.Supp. 1329, 1339 (D.D.C.1985). Even where a contract disclaims all warranties or guaranties, the government is under a duty to fashion material estimates with reasonable care. *See Celeron Gathering Corp. v. United States*, 34 Fed.Cl. 745, 752 (1996) (citing *Medart v. Austin*, 967 F.2d 579, 581 (Fed.Cir.1992) and *Womack*, 182 Ct.Cl. at 412–13, 389 F.2d at 801). Furthermore, "[t]he traditional reluctance of courts to cast the burden of negligent actions upon those who were not actually at fault is particularly applicable to situations in which there is a vast disparity in bargaining power and economic resources between the parties, such as exists between the United States and particular government contractors." *Seckinger*, 397 U.S. at 211–12, 90 S.Ct. 880. The government thus cannot rely on broadly worded exculpatory clauses to avoid liability for affirmative misrepresentations. *See Celeron Gathering Corp.*, 34 Fed.Cl. at 752; *Michigan Wisconsin Pipeline v. Williams–McWilliams*, 551 F.2d 945, 953 (5th Cir.1977) ("Caveatory and exculpatory contractual provisions will not shift the liability flowing from an express or implied representation made by the Government and reasonably relied on by the contractor.") (quoting *Maurice Mandel, Inc. v. United States*, 424 F.2d 1252, 1255–56 (8th Cir.1970)); *see also Mountain Home Contractors v. United States*, 192 Ct.Cl. 16, 425 F.2d 1260, 1264 (1970).

The government argues that, even if there was a misrepresentation, the contract's site investigation clause placed an affirmative duty on DFK to investigate wind conditions. It contends that DFK's site investigation efforts prior to bidding were insufficient to fulfill that duty, and thus that DFK should not be permitted to recover on its breach of contract claim.

DFK's contract contained the standard site investigation clause found at FAR 52.236–3, the relevant part of which stated:

> The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to ... (3) uncertainties of weather, river stages, tides, or similar physical conditions at the site[.]

 As a general rule, a contractor required to conduct a pre-bid site investigation is held to the standard of reasonableness. *See Servidone Constr. Corp. v. United States*, 19 Cl.Ct. 346, 373, 1990 WL 8232 (1990) ("The adequacy of [a contractor's] site investigation must be measured against what a reasonable, intelligent con-

tractor, experienced in the particular field of work, would discover."); *see also Liles Constr. Co. v. United States,* 197 Ct.Cl. 164, 185, 455 F.2d 527, 538 (1972); *North Slope Technical Ltd., Inc. v. United States,* 14 Cl.Ct. 242, 253 (1988). The site investigation clause placed a duty on DFK to investigate the weather conditions that it would face at the job site. Part of that duty requires a bidder to investigate information to which it is directed by the contract. *See Flippin Materials Co.,* 160 Ct. Cl. at 365, 312 F.2d at 412–13. Failure to review such information alone, however, does not warrant denial of a claim, if the information is irrelevant. *See Fru–Con Constr. Corp. v. United States,* 44 Fed.Cl. 298, 308 (1999).

 Kappos, on behalf of DFK, conducted a site investigation visit in July of 1994. As noted above, when Kappos asked Corps representatives about wind conditions, he was told "It's hot, and we get some winds occasionally." When an offeror later enquired as to the "normal wind speed at the job site," the Corps suggested that offerors contact the U.S. Weather Service in El Paso. DFK did not call the weather service prior to submitting its bid, but it called later, after experiencing extensive delays and being forced to suspend work due to wind conditions. Kappos testified in his deposition that the Weather Service told DFK it did not have wind data for WSMR, and suggested that DFK contact NOAA in Washington. Kappos stated that he received some "general wind information" from NOAA; in his affidavit, however, he states that NOAA informed him it did not keep specific wind data for WSMR.

On May 25, 1995, DFK directed a request to the CO, asking for seasonal wind information for the five years prior to contract award. The CO responded to this request on June 29, 1995, informing DFK that the Corps could not provide any wind data directly, but that wind data for the job site could be obtained from "Missile Station C" at WSMR. DFK was told that the cost was $173.00 for each yearly data report, and that it would take two to three weeks to obtain the reports once they were ordered. DFK eventually obtained a study prepared by the Corps enti-tled "Climate Calendar, White Sands Missile Range 1950–1995." This report indicated that weather at WSMR for the "period from March through early May is characterized by a strong westerly wind flow and periods of blowing sand and dust." The report also states that "the mountains that surround WSMR often influence local weather and add noticeably to the gustiness of the winds during periods of high winds."

Even assuming this information would have countered any mistaken impression created by the chart, the current state of the record is insufficient to conclude the information was reasonably available to plaintiff. Instead, the record suggests that the initial contract references would not have provided bidders with relevant information. Nor is the court prepared to hold that plaintiff had to order back copies of yearly weather reports. Moreover, the government's references in its supplemental brief to potential sources such as New Mexico State University or local television stations are unsupported by evidence. In sum, trial is necessary to determine whether DFK's site investigation was reasonable. *See McCormick Construction Co., Inc. v. United States,* 12 Cl.Ct. 496, 498 (1987) (denying motion for summary judgment on differing site condition claim where issue was the reasonableness of plaintiff's site investigation efforts and adequacy of government data supplied to the plaintiff); *Brechan Enterprises, Inc. v. United States,* 12 Cl.Ct. 545, 551 (1987) (issue of whether a reasonable contractor would have anticipated the actual conditions at the job site raised questions of sufficiency of government data and adequacy of contractor's site investigation, which were "peculiarly fact-intensive", making summary judgment inappropriate).

## CONCLUSION

For the reasons stated herein, the motions for summary judgment of both parties are denied. The parties are directed to file a joint status report on or before December 23, 1999, proposing a schedule for further pretrial activities.